No. 37.—Mary C. Beall, administratrix, &c. and others, *vs.* William H. Beall and Elisha H. Beall, defendants.

[1.] Bastards may be made legitimate, and capable of inheriting, by an Act of Parliament. The Legislature of Georgia possess the same power.

[2.] In *England*, the *sovereignty* of the nation resides in the *Government*—in *this country*, the *supreme power* is in the *people.*

[3.] In *England*, the *omnipotent authority* of the Parliament is the *dernier* resort in all matters of difficulty and importance ; in *this country*, the *written Constitution.*

[4.] The General Assembly in this State has power to make all laws and or-

Beall and others *vs.* Bealls.

dinances which *they* shall deem necessary and proper "for the good of the State," provided they are not repugnant to the Constitution of the United States, the laws of Congress, passed pursuant thereto, public treaties and the Constitution of the State.

[5.] To disregard the laws of the State, is a capital crime against society, and great vigilance is necessary to see to it, that they are equally respected, by *those who govern*, as well as those who are destined to obey.

[6.] Notwithstanding the Judiciary is the weakest of the three departments of the Government, and is therefore less dangerous to public liberty than either of the other two, still it is both the right and duty of *all* Courts to declare all Acts void, which plainly and palpably violate the Constitution.

Mr. Elias Boudinot, a distinguished Representative in Congress, rejoiced, that if, from inattention, want of precision, or any other defect, he should do wrong as a legislator, there was a power in the Government which could, constitutionally, prevent the operation of a wrong measure from affecting his constituents.

[7.] An individual's right to his property consists, not only in its present enjoyment, but also its future disposition, and he can be deprived of neither, except for public uses, without his consent.

[8.] Where an Act of the Legislature is passed, legitimatising W and E to A B, their reputed father, and authorising them to inherit from him, his assent will be presumed; more especially when the reputed father lives five years after the law is passed.

[9.] The power of the Legislature to pass an Act, changing the law of descents, as it respects a particular individual, without his consent and against his will, is contrary, not only to the definition of law, "as a *rule* of civil conduct," applicable to the *whole* State, but to the genius and spirit of our institutions.

[10.] A private Act of the Legislature, as to its facts and recitals, imports verity, equally with the records of the Courts; still it may be attacked for fraud in its procurement.

[11.] No inheritance can vest, nor any person be the actual, complete heir of another, till the ancestor is dead.

[12.] A husband may, by *deed* or *will*, in his lifetime, deprive his wife of the whole of his estate, except dower; so also, he can procure an Act of the Legislature to be passed, limiting her right of inheritance after his death.

[13.] The Legislature in Georgia, and not the Courts, are intrusted with the discretion of determining what laws are promotive of the public morality, or otherwise.

[14.] While it is true, that too much countenance ought not to be given to the indulgence of criminal desire, nor encouragement to the increase of spurious offspring, still that policy may well be doubted which would reject all provision made for illegitimate children, and suffer them to be cast, naked and destitute, upon the world.

*Illegitimacy* will be viewed with much less favor, in criminal proceedings, than in mere questions of property and succession.

[15.] Virginia, and many other States of the Union, have, by Statute, adopted the rule of the Civil, in opposition to that of the Canon and Common Law, whereby ante-nuptial children are legitimated by the subsequent marriage of the parents and the recognition of the father.

[16.] Courts ought so to construe Statutes of Distribution as would most likely effectuate the intention of the parties, had they died *testate*.

[17.] Courts and Judges, eminent for their learning, have regarded bastards as having strong claims to equitable protection.

[18.] There is a growing tendency everywhere, and especially in this country, to relax the ancient rigor of the law in respect to bastards, and to look to the Penal Code, and to the guilty parties, for the prohibition and prevention of fornication and adultery, rather than visit the vengeance of the law upon the innocent heads of the unfortunate offspring. The law, in its humanity, will not deny to those who have been the authors of their disgrace, the power to repair the mischief, as far as they can, by *gift, will* or *legislative enactment*.

[19.] The Constitution declares, that the three powers of the Government—viz: the Legislative, Executive and Judiciary—shall be distinct; still the separation is not, and from the nature of things, cannot *be total*.

[20.] Whether the sanction of the Executive is necessary to an Act, before it can become a law in this State ?    *Quere*.

[21.] The Constitution might have conferred upon any one or more of these branches powers, which, in their nature, would more appropriately have belonged to another.

[22.] In the absence of any provision upon the subject, the power to legitimate bastard children, and to change the rules of inheritance, would belong, necessarily, to the Legislature.

[23.] The Act of 1843, changing the names of the complainants, and legitimating them, is purely *legislative* in its character—one not prohibited by the Constitution—and which should not only be supported, but construed favorably by the Courts.

[24.] All departments of the Government should be considered equally honorable, useful and patriotic ; neither attempting to disparage, or entertaining any undue sensitiveness or jealousy toward the other, nor suspecting encroachments where none were intended.

[25.] Measures, exclusively of a *political, legislative* or *executive* character, are not examinable by the Courts. In *such* case, the remedy for any real or supposed abuse, is solely by appeal to the people, *at the elections*.

[26.] The judicial authority is the final and common arbiter, under the distribution of power by the Constitution, of all questions which, from their nature, require and admit of legal investigation and decision. The friends of republican government and public liberty, have uniformly denounced and rebuked, in the strongest terms, the usurpation of judicial powers, by the Legislature or Executive, as constituting the very essence of tyranny and despotic government.

In Equity, in Upson Superior Court.    Decision on demurrer, by Judge FLOYD.    October Term, 1849.

By an Act of the General Assembly of Georgia, assented to 23d December, 1843, " to change the names of certain persons, and to render them legitimate, and capable of inheriting," and by the first section thereof, it was enacted, " that the name of William Hiram Padgett, of the County of Muscogee, be changed to the name of William Hiram Beall, and that the name of Elisha Harvey Padgett, of said County, be changed to that of Elisha Harvey Beall, and that they be legitimatised, and known as the legitimate children of Alpheus Beall, of Upson County, their reputed father, and fully capable of inheriting real and personal estate of the said Alpheus Beall, by virtue of the Statutes of Distribution of this State, and entitled to all the privileges which they would have been, had they been born in lawful wedlock."

In July, 1848, Alpheus Beall died intestate, leaving his wife, Mary C. Beall, and the two children mentioned above.    Mary C. Beall obtained letters of administration on the estate.    Wm. H. Beall and Elisha H. Beall filed a bill against the administratrix, for distribution.    To this bill, a demurrer was filed, on the ground, that the Act legitimatising the complainants, was inoperative and void—

1. Because it violates the absolute rights of Alpheus Beall and Mary C. Beall.

2. Because it is in derogation of the common rights of Alpheus Beall, to have for his heirs his wife and lawful children.

3. Because it is in derogation of the common right of Mary C. Beall, the wife of Alpheus Beall.

4. Because the Act is judicial, and not legislative.

5. Because it is against public policy.

6. Because it is unconstitutional.

The Court overruled the demurrer, and defendants excepted.

O. C. GIBSON, for plaintiff in error, cited the following authorities :

1 *Mad. Ch.* 98, 627.    1 *Har. Ch.* 522, '3.    1 *Bl. Com.* 450, 89, 139.    *Smith's Com.* 247, '9, 267 *to* 272, 277 *to* 286, 478 *to* 480.    *Hale's Com. Law,* (*title, " Analysis," page* 31, *in the last*

*of the book,*) 242, 274. 4 *Jac. Law Dic.* 153, '4. 2 *Black. Com.* 11, (*n.* 3,) 247. 2 *Kent,* 263, 268, 276, 173, 263. 4 *Ib.* 372. 1 *Bac. Abr.* 368. *Schley Dig.* 40, 46, 427. 7 *Ga. Rep.* 92. 1 *Kent,* 391, '2. 19 *Wend.* 659.

T. W. GOODE, for defendants in error, cited the following authorities :

2 *Kent.* 176. 1 *Bl. Com.* 459, 91, 41, (*note* 3,) 125. 2 *Peters,* 317, 318. 5 *Ga. Rep.* 201. 4 *Ga. Rep.* 47. 2 *Black. Com.* 10, 12, 493, 494, 201.

*By the Court.*—LUMPKIN, J. delivering the opinion.

Alpheus Beall having departed this life, intestate, in July, 1848, administration was granted on his estate, to his widow and relict, Mary C. Beall. In September, 1849, Wm. H. Beall and Elisha H. Beall filed their bill against the said Mary C. in the Superior Court of Upson County—claiming, as the children and distributees of the intestate, two-thirds of his estate. It is admitted that the complainants were born out of lawful wedlock ; and their right to the property depends upon an Act of the Legislature, passed in 1843, and which is set forth in the record. By it, the names of sundry persons, in no way connected with each other, are changed, and they are respectively legitimated to their reputed parents.

The first section is in these words : " *Be it enacted by the Senate and House of Representatives in General Assembly met, and it is hereby enacted, by the authority of the same,* That the name of William Hiram Padgett, of the County of Muscogee, be changed to the name of William Hiram Beall ; and that the name of Elisha Harvey Padgett, of said County, be changed to that of Elisha Harvey Beall ; and that they be legitimatised, and known as the legitimate children of Alpheus Beall, of Upson County— their reputed father—and fully capable of inheriting real and personal estate of the said Alpheus Beall, by virtue of the Statute of Distributions of this State, and entitled to all the privileges which they would have been, had they been born in lawful wedlock." *Pamphlet Laws, p.* 176, *A. D.* 1843.

But for the zeal and ability with which the complainants' right

to recover has been resisted, it would not have occurred to the Court that there was any serious difficulty in this case.   As it is, the argument which has been pressed with so much earnestness, shall receive, as it deserves, the most patient and respectful consideration, at our hands.

[1.]  We are met upon the threshold of this discussion, with a broad *negation* of the *power* of the *Legislature* to pass laws for the *legitimation* of *bastards*.   It is the first time I ever heard this power doubted.

Judge Blackstone says, that a bastard may be made legitimate and capable of inheriting, by the transcendant power of an act of Parliament, and not otherwise.   1 *Bl. Com.* 369.

Has the Legislature of Georgia the same power over this subject, which is possessed by the British Parliament?

This inquiry leads, necessarily, to an examination of the relative powers possessed by the British Parliament and our State Legislature, and the foundations upon which they respectively rest.

[2.]  In Great Britain, the theory of Government is, that the *sovereignty* of the nation resides in the Parliament—consisting of King, Lords and Commons.   By gradual and immemorial usurpations, it has been completely wrested from the *people.* Hence it is, that English writers speak familiarly of the *omnipotence* of the Parliament.   But the order of things here is exactly the reverse of this: the *supreme power* resides in the *people.* There, the government is master of the people; here, the people are masters of the government.

[3.]  And notwithstanding we hear so much of the British Constitution—celebrated, as it has been, in the most sublime and elaborate strains—by poets, orators, lawyers and statesmen—as "a noble fabric, raised by the labor of so many centuries, repaired at the expense of so many millions, and cemented by such a profusion of blood—a fabric that has resisted the efforts of so many races of giants"—no such thing as a constitution—properly so called—exists in that kingdom.   Like their Common Law, there is no record, *in writing*, of its provisions.   The sphere of the various departments of the Government—legislative, judicial and executive—is not accurately defined—the orbit of each clearly delineated—their respective powers and duties known and assigned.   *Their* Constitution, instead of being the controller and

guide, is the creature and the dependant of the Parliament. The *omnipotent authority* of the Parliament, instead of the *Constitution,* is the *dernier* resort to which recourse is had, in times and in doctrines of uncommon difficulty and importance; and its power is absolute and uncontrollable, inasmuch as it may alter or change the Constitution itself—such as it is—at pleasure.

But here, we have written Constitutions, both in the Federal Government and the individual States; and these written Constitutions are the acts of the *people,* and not of the *Government.* In these, *their sovereign will* is embodied—and by these, the powers of Government are respectively distributed into three distinct and co-ordinate branches—viz. the legislative, the executive, and the judiciary—all of which are equally bound by duty to their constituents, the people.

[4.] What power, then, have the people of Georgia delegated, in the Constitution, to the Legislature, which enacted the Statute under which William H. and Elisha H. Beall claim? The grant is exceedingly broad : "The General Assembly shall have *power* to make *all* laws and ordinances which *they* shall deem necessary and proper, for the good of the State, which shall not be repugnant to the Constitution." *Art.* 1, §22, *Prince,* 905.

While I utterly repudiate the opinion of Mr. Jefferson, "that the *ordinary* Legislature may alter the Constitution itself," (*Notes on Virginia, p.* 215,) (except in the mode which the people themselves may prescribe in that instrument—(see *Art.* 4, §15, *Prince,* 913,)—for this, indeed, would be to clothe republican Legislatures with the *omnipotence* attributed to the British Parliament)—yet, I ask, is it not manifest, that *all* acts of the Legislature are *valid,* which do not violate, infringe or impair the Federal Constitution, the laws of the United States, made pursuant thereto, any treaty made under the authority of the United States, and the Constitution of this State?

[5.] And will not such laws be binding upon any other branch of the Federal or State Government, as well as upon any individual citizen?

If it is not so, then the idea that the *people* are *sovereign,* in this State, is a vain phantom. If the Executive or Judiciary refuse to execute, in good faith, the will of the people, as constitutionally expressed in the Acts of the Legislature, passed in subordination to the Constitution, then, indeed, is the foundation of public tran-

quility, as well as of popular institutions, sapped and undermined. For myself, I must disclaim all such right.   The Legislature may pass laws the most absurd and unreasonable—if it be not disrespectful to suppose such a thing—still, if they be *constitutional*, the *people* have made *them* the sole and exclusive judges, whether or not they are "*for the good of the State.*"   The Judges are not at liberty to reject them; the Executive is bound to observe and enforce them.   " The best laws," says Vattel, " are useless, if they are not religiously observed.   The people," continues this writer, " ought to watch very attentively, in order to render them equally respected, *by those who govern* and by the people destined to obey.   To disregard the laws of a State, is a capital crime against society; and if those guilty of it are invested with authority, they add to this crime a perfidious abuse of the power with which they are clothed."   *Vattel's Law of Nations, b.* 1, 3, *art.* 30.

Our conclusion, therefore, is, that the General Assembly had the power to pass this Act.   It is one which has been exercised ever since the organization of the State Government, and one which is habitually practised by every State Legislature in the Union.   See *Griffith's Annual Law Register, title, Bastards, and Statutes of Georgia, passim.*

[6.] But it is argued that this Act *is* unconstitutional.   If this be *clearly* so, then, notwithstanding it may be true, as asserted in the *Federalist,* that "the Judiciary is, beyond comparison, the weakest of the three departments of power—that it can never attack, with success, either of the other two, and all possible care is requisite to enable it to defend itself against their attacks"—(*No.* 78)—or, in the language of Montesquieu, " of the three powers— the legislative, executive, and the judiciary—the judiciary is next to nothing"—(*Spirit of Laws, vol.* 1, *p.* 186)—still, I repeat, if this Act is a plain and palpable violation of the Constitution, this Court has the power, and it becomes its imperative duty, to declare it so.   Nor is the power of passing upon the constitutionality of a State Statute, restricted to this branch of the Judiciary.   It necessarily belongs to every grade of magistracy—from the highest to the lowest; nay, municipal corporations, when exercising judicial functions, are vested primarily with this power. *Indiana &c. Turnpike vs. Phillips,* 2 *Pennsyl.* 184.   *Moore vs. Houston,* 3 *S. & R.* 169.   *People vs. Foot,* 19 *Johns.* 58.   *Ex parte*

*McCollum,* 1 *Cowen,* 550.   *Vanuxem vs. Hoglehersts,* 1 *South.* 192.
*Olden vs. Hallet,* 2 *South.* 466.   *Whittington vs. Polk,* 1 *Har.* &
*J.* 236.   *Norris vs. Trustees of Abingdon Academy,* 7 *Gill.* &
*Johns.* 7.   *Crane vs. McGinnis,* 1 *Gill.* & *Johns.* 463.   *Derby
Turnpike Company vs. Parks,* 10 *Conn.* 522.   *Goshen vs. Stoning-
ton,* 4 *Conn.* 225.   *Hill vs. Sunderland,* 3 *Vermt.* 507.   *Starr vs.
Robinson,* 1 *Chip.* 257.   *Dupy vs. McKinnie,* 1 *Chip.* 237.   *Stan-
iford vs. Barry,* 1 *Aik.* 314.   *Woart vs. Winnick,* 3 *N. Hamp.*
473.   *Dow vs. Norris,* 4 *N. Hamp.* 16.   *Piscataqua Bridge vs.
N. H. Bridge et al.* 7 *N. Hamp.* 65, 66.   *Lunt's Case,* 6 *Greenl.*
412.   *Bowdoinham vs. Richmond,* 6 *Greenl.* 112.   *Lewis vs. Webb,*
3 *Greenl.* 326.   *Durham vs. Lewiston,* 4 *Greenl.* 140.   2 *Peters,*
522.   12 *Wheat.* 270.   3 *Dall.* 386.   2 *Dall.* 309.   4 *Dall.* 18.
6 *Cranch,* 128.   *Charlt.* 175.   *Ib.* 235.   *Walker,* 146.   1 *Blackf.*
206.   1 *Breese,* 70, 209.   2 *Porter,* 302.   1 *Marsh.* 290.   2 *Litt.*
90.   4 *Monroe,* 43.   5 *Hayw.* 271.   *Cooke,* 217.   4 *Yerg.* 202,
9 *Ib.* 490.   3 *Desauss.* 476.   1 *McCord,* 238.   *Harp.* 385.   1
*Hayw.* 28.   1 *Murp.* 58.   6 *Rand.* 245.   1 *Va. Cases,* 20.   1
*Binn.* 419.   2 *Yeates,* 493.   5 *Binn.* 355.   11 *Mass. R.* 396.   13
*Pick.* 60.   15 *Mass. R.* 407.   7 *Pick.* 466.

The right here asserted, is a necessary attribute of every
Court in the country, as will appear from the fact, that if there
happens to be an irreconcilable variance between the Constitu-
tion—which is the fundamental law—and a particulur Act pro-
ceeding from the legislative body, that which has the superior
obligation and validity, ought, of course, to be preferred; in
other words, the Constitution ought to be preferred to the
Statute—the intention of the people, to the intention of their
agents.   Nor does this conclusion, as is shown in the work first
above cited, by any means suppose a superiority of the judicial
to the legislative power.   It only supposes that the power of the
people is superior to both, and that where the will of the *Legis-
lature,* declared in *Statutes,* stands in opposition to that of the
*people,* declared in the *Constitution,* the Judges ought to be go-
verned by the *latter,* rather than the *former.*   They ought to reg-
ulate their decisions by the fundamental laws, rather than those
which are not fundamental.   If two Statutes clash, the Courts
decide that the last in order of time shall control; and if the will
of the *original* and *superior* authority interferes with that of the
*derivative* and *inferior,* nature and reason alike teach, that the

latter must yield; and, accordingly, that it will be the duty of *every* judicial tribunal in the land, to adhere to the Constitution, and disregard a particular Statute that contravenes it.

The following apposite remarks are from Mr. *James Wilson*, formerly one of the Associate Justices of the Supreme Court of the United States :

" In this country, the legislative authority is subjected to the control arising from the Constitution. From the Constitution, the legislative department, as well as every other part of the Government, derives its power; by the Constitution, the legislative, ·as well as every other department, must be directed; of the Constitution, no alteration by the Legislature can be made or authorized. In our systems of jurisprudence, these positions appear to be incontrovertible. The Constitution is the supreme law of the land. To that supreme law, every other power must be inferior and subordinate.

" Now, let us suppose, that the Legislature should pass an Act manifestly repugnant to some part of the Constitution, and that the operation and validity of both should come regularly in question, before *any* Court. The business and design of the judicial power is, to administer justice, according to the law of the land. According to two contradictory rules, justice, in the nature of things, cannot possibly be administered. One of them must; of necessity, give place to the other. Both, according to our supposition, come regularly before the Court, for its decision on their operation and validity. It is the right, and it is the duty, of the Court, to decide upon them. Its decision must be made, for justice must be administered, according to the law of the land. When the question occurs—What is the law of the land?—it must also decide this question. In what manner is this question to be decided ? The answer seems to be a very easy one. The supreme power has given one rule—a subordinate power has given a contradictory rule; the former is the law of the land; as a necessary consequence, the latter is void, and has no operation.

" This is the necessary result of the distribution of power, made by the Constitution, between the Legislature and the judicial departments. The same Constitution is the supreme law to both. If that Constitution be infringed by one, it is no reason that the

infringement should be abetted, though it is a strong reason that it should be discountenanced and declared void by the other.

" The effects of this salutary regulation, necessarily resulting from the Constitution, are great and illustrious. In consequence of it, the bounds of the legislative power—a power the most apt to overleap its bounds—are not only distinctly marked in the system itself, but effectual and permanent provision is made, that every transgression of those bounds shall be adjudged and rendered vain and fruitless. What a noble guard against legislative despotism!

" This regulation is far from throwing any disparagement upon the legislative department. It does not confer upon the judiciary a power, superior in its general nature, to that of the Legislature; but it confers upon it, in particular instances, and for particular purposes, the power of declaring and enforcing the superior powers of the Constitution—the supreme law of the land.

" This regulation, when considered properly, is viewed in a favorable light by the Legislature itself: ' It has been objected,' said Mr. Boudinot, a learned and distinguished member of Congress, ' that by adopting the bill before us, we expose the measure to be considered and defeated by the Judiciary, which may adjudge it to be contrary to the Constitution, and therefore void, and not lend their aid to carry it into execution. This gives me no uneasiness. I am so far from controverting this right in the Judiciary, that it is my boast and my confidence. It leads me to greater decision on all subjects of a constitutional nature, when I reflect, that if, from inattention, want of precision, or any other defect, I should do wrong, there is a power in the Government which can constitutionally prevent the operation of a wrong measure from affecting my constituents. I am legislating for a nation, and for thousands yet unborn; and it is the glory of the Constitution, that there is a remedy for the failures even of the Legislature itself.' " *Wilson's Lectures on Law,* 1 *vol.* 460, '1, '2, '3.

I could multiply quotations to the same effect, to any extent, from Judge *Tucker,* in his Appendix to Blackstone—Mr. Justice *Woodbury,* in *Merrill vs. Sherburne,* 1 *N. Hamp. Rep.* 199—and many others of the ablest and soundest constitutional jurists and statesmen that have adorned our country. But these, I hope, will suffice to place this delicate and important principle in its true

and proper light.   Assuming, then, that it is both our right and duty, to pronounce this Act void, provided it manifestly appears to be *unconstitutional*, we ask, wherein is it obnoxious to this objection ?

[7.] We fully recognize the principle insisted upon with so much earnestness, by counsel for the plaintiff in error—that the property of Alpheus Beall cannot be taken from him and given to another, without his consent and against his will; and that his right to it consists not only in its enjoyment during his life, but to its future disposition, after his death.   But we respectfully submit, that this is not the question presented for our adjudication. For, conceding that the assent of Alpheus Beall was necessary, *constitutionally*, to the efficacy of this Act—or, as a condition precedent to its taking effect—still, a becoming respect for the other two co-ordinate departments of the Government, would compel us *to presume* that such assent was given.

[8.] And this legal presumption is greatly strengthened, in the present case, from the fact, that Alpheus Beall lived *five years* after this Statute was passed, and took no steps, so far as we are informed from the evidence before us, to defeat it, either by attacking it directly for fraud in its procurement, or making such testamentary disposition of his estate, as would counteract or thwart its provisions.   Again, the general rule, now universally adopted by the Courts, of inferring consent to an Act like this, is the more justifiable in this State, where all Acts and Ordinances are held and made *public laws;* and the several Courts of Law and Equity in this State, (*a fortiori,* individuals?) are bound to notice them as such.   *Prince,* 215.

[9.] Indeed, the Supreme Court of North Carolina have intimated, that the Legislature have the power to enact such a law as this, without the consent of the reputed father, express or implied.   Chief Justice *Ruffin,* in *Perry et al. vs. Newsom,* (1 *Iredell's Eq. Rep.* 28,) says, "We do not mean to say, positively, that the Legislature cannot make one who is out of the line of descents, succeed to an ancestor, instead of him who would be heir according to the general law.   Perhaps, if the power of disposition by the ancestor in his lifetime, be not restricted, and as *the law* gives the *capacity* to inherit, it may not be beyond the power of the Legislature, by even a private law, passed before

the death of the owner, to annul the capacity of one person to succeed, and confer it on another."

I should seriously question the power of the Legislature to pass a private Act, changing the law of descent, as it respects one individual of the community, without his consent, when it left all the rest of the citizens of the State unmolested by its operation. Such an Act, in my humble judgment, to be valid, must be on petition of the party, or by his consent, express or implied. The Constitution, it is admitted, authorizes the Legislature to pass *all laws;* but one of the essential elements of *law* is, it must be *general*—a *rule* prescribed for the civil conduct of the *whole community,* and not a transient *order* from a superior, to or concerning a *particular person.* 1 *Bl. Com.* 44. . Under our institutions, all men are considered as equal, and the same laws should apply alike to all. If it be fit and proper that one individual's property should descend in a particular way, then it is equally so, that every other individual's should descend the same way. This is the very genius and spirit of our system; and were the Legislature to single out an individual and declare, that, dying intestate and wanting lineal descendants, his *uncles,* instead of his *cousins,* should inherit his estate, but that in every other case the *cousins* should be the next collateral heirs, we should be strongly inclined to hold, that this was *not law,* for the reason already assigned.

[10.] Here, however, this objection does not exist; for we hold, that *as to the facts* in this case, every Court must receive them as importing verity, to the same extent that the records of the Court are evidence to the Legislature, or another Court, of the matters of fact transacted in the Court, and of which the record is the memorial; and although not *conclusive,* they are to be treated as true, until the contrary appear. 4 *Dev. L. Rep.* 110, *Drake et al. vs. Drake et al.* I am equally clear, however, that such an Act may be relieved against, upon the ground of false suggestion and fraud. This is the doctrine, undoubtedly, of the English Courts, as to private Acts of Parliament, notwithstanding its plenary powers.

[11.] So much, then, as to the interest of Alpheus Beall, himself, in his property, present and prospective. It is argued, however, that the marital rights of his wife attached, and that these cannot be curtailed by this Act, without *her* consent. *Nemo est hæres viventis*—no one can be heir during the life of his ancestor—

is the familiar maxim of the Common Law.  *Co. Litt.* 22, *b.*
" By law," says Mr. *Broom,* in his comments upon this maxim,
" no inheritance can vest, nor can any person be the actual, com-
plete heir of another, till the ancestor is previously dead ; before
the happening of this event, he is called heir apparent, or heir
presumptive ; and his claim must necessarily be to an estate
which remained in the ancestor, at the time of his death, and of
which he has made no testamentary disposition; so that it is sub-
ject to be defeated, by the superior title of an alienee in the an-
cestor's lifetime, or of a devisee under his will."   *Broom's L. M.*
223.   2 *Bl. Com. by Stewart,* 231.   *Co. Litt.* 8, *a.*   1 *Steph. Com.*
358.

[12.] If, then, Alpheus Beall could, by *deed* or *will,* in his life-
time, have deprived his wife of the *whole* of his estate, except
dower, is it not clear, that he could procure an Act of the Legis-
lature to be passed, which would limit her to one-third of it, *by
descent,* after his death ?

[13.] Again, this Statute is attacked upon the high and lofty
principles of honor and morality ; and authority is not wanting
for this notion.   Lord *C. B. Gilbert* places the exclusion of bas-
tards from the feudal succession, upon this ground : " The Lords,"
says he, " would not be served by any persons that had that stain
on their legitimation, nor suffer such immoralities in their several
clans."   *Gilbert on Tenures,* 17.   *Heineccius,* in his *Dissertation de
Levis Notæ Macula,* states that they are excluded from the in-
heritance in Germany, and bear the mark of disgrace—*semper
levi nota adspersi fuisse videntur ;* and the writer bestows a highly
wrought eulogium upon this branch of Germanic jurisprudence.

Our answer to this position, however, is, that the *people* of
Georgia, in their written Constitution, have seen fit to intrust the
*General Assembly,* and not the *Judiciary,* with the discretion of
determining whether or not this kind of legislation is promotive
of the public morality, or, in other words, is "*for the good of the
State;*" and should we, as we have been so solemnly and elo-
quently urged to do, assume jurisdiction over a subject that, in
the distribution of power, has been committed to another depart-
ment of the Government, the question might well be propounded
to us, which was addressed to Moses, by the Hebrew, " who
made *thee* a judge" in this matter ?   And I apprehend, we should

find it greatly more difficult to return a satisfactory answer, than did the divinely-called and commissioned leader of the Israelites.

[14.] But were it otherwise—were this an open question, to be settled by the *Courts*, instead of the *Legislature*, much might be said in favor of the policy pursued by the reputed father of these complainants; for, while on the one hand, too much countenance ought not to be given to the indulgence of criminal desire, or encouragement to the increase of spurious offspring, still that policy may well be doubted, which would reject all provision made for children thus unfortunately circumstanced, and suffer them to be cast, naked and destitute, upon the world.    In the case of the *Marchioness of Annandale vs. Anne Harris*, (2 *P. Wms. R.* 432,) where the Marquis of Annandale, in his lifetime, had unlawful familiarities with Anne Harris, who was before a modest woman, but the Marquis seduced her, and had a child by her, and gave a bond to her for the payment of £2000, within a year after his death, for her use and benefit, as well as that of the child, and his *widow* having brought her bill in Equity, to be relieved against the deed, as gained upon unlawful and wicked consideration, Lord Chancellor *King* said, "If a man does mislead an innocent woman, it is both reason and justice, he should make her a reparation; *but this case is stronger in respect of the innocent child, whom the father has occasioned to be brought into the world in this shameful manner, and for whom, in justice, he ought to provide.*" And Chancellor *Kent*, in referring to this language, speaks of it as "much more conformable to *justice* and humanity," than some of the "*hard*" decisions which had preceded it. 2 *Kent's Com.* 217.

In *Beachcroft vs. Beachcroft*, (1 *Mad. Rep.* 430,) the testator died a bachelor, leaving five natural children by an East Indian woman.    He bequeathed, by his will, £5000 to each of his children, and 6000 Sicca rupees to the mother of his children. There was no other description of the legatees in the will.    It was allowed to be proved, *dehors* the will, that the testator had recognized them as his children, and had sent three of them to England for an education.    The legacies were decreed to them.

The point in *Gardner vs. Heyer*, (2 *Paige*, 11,) was, whether the four natural children of the testator—one son and three daughters—should take as legatees under his will?    And Chancellor *Walworth* thus expresses himself, "If there is not some

unbending rule of law, which makes it the duty of the Court *to punish the innocent and unoffending offspring for the sins of their parents*, I do not see how these legatees can be deprived of the property which was intended to be given them by the testator."

[15.] The Legislature of Virginia, in 1785, passed an Act, which is now incorporated in the Revised Code of that State, and which has been adopted in a large portion of the Union, recognizing the rule of the Civil Law, in opposition to the Canon and Common Law, namely: that ante-nuptial children are legitimated by subsequent marriage, and the acknowledgment of the children by the father.

A question arose, under the Virginia Act, in *Stones vs. Keeling*, (*note to Rice vs. Efford*, 3 *Hen. & Munf.* 228,) when the Court seemed to think, that *illegitimacy* was to be viewed very differently, *where matters of property and succession were concerned*, than in criminal prosecutions; and that, notwithstanding any legal bar, the law ought, in the former case, to receive the most liberal construction, "it being undoubtedly the design of the Legislature to establish the most liberal and extensive rules of succession to estates, in favor of all in whose favor the intestate himself, had he made a will, might have been supposed to be influenced; and here, there can be no doubt, had he died *testate*, that these (*natural*) daughters would have been the first objects of his care."

[16.] I ask, can there be a doubt, but that if Alpheus Beall had died *testate*, that he would have preferred that *two-thirds* of his estate should have gone to these complainants, who, although illegitimate, are, nevertheless, descended from his loins—bone of his bone, and flesh of his flesh—than that the *whole* should, through right of inheritance, or by will from his widow, have passed over to *her* next of kin, who are strangers to his blood? If this be so, then this Statute should receive the most beneficial construction in behalf of these complainants. 2 *Fonb.* 124.

I am fully warranted in this assertion, by the facts set forth in the following extract from the complainants' bill, and which, by the demurrer, are admitted to be true:

" And your orators charge, that sometime before the death of said Alpheus Beall, (near twelve months,) he wrote a letter to Frederick Beall, his brother, at Lumpkin, Stewart County, to come and see him; that said Frederick did come to Thomaston, in pursuance of the request, and when the said Alpheus Beall met

his brother, and took him by the hand and cried like a child, and after becoming calm and composed, he told Frederick, that he had sent for him to write his will, and wanted to bequeath to his said wife, Mary C. Beall, what property she brought with her, at the marriage, (a negro woman, Sukey, and some other articles of not much value,) to his wife, absolutely, and that all of his own property, raised and realized by his own efforts and industry, he wished disposed of so as to give a lifetime estate of one-third to his wife, the remainder to your orators, forever, share and share alike, and the third given his wife for life, to revert back, at her death, and go to, and become the property of, your orators, forever, in equal proportions ; that said Frederick Beall advised him to make no will, but leave the matter where the law would take it, and distribute one-third to the wife, the other two-thirds to your orators, absolutely, to which said Alpheus Beall consented reluctantly.

"Your orators charge, that Frederick Beall is now deceased; but your orators charge, that all these things that passed between said Alpheus Beall and his said brother, were known to said Mary C. Beall."

[17.] Judge *Tucker*, in delivering the opinion of the Court in *Sleigh vs. Shider*, (5 *Call's Rep.* 439,) speaks of a similar law to that which we are considering, as having done all it could "to protect and provide for the innocent offspring of indiscreet parents."

In the case of *Pratt's Lessee vs. Flamer et al.* (5 *Har. & Johns.* 10,) the Court say, "Where can be the justice or policy in punishing the innocent offspring for the criminal, illegitimate intercourse between their parents? Their situation is deplorable enough, without being deprived of the pecuniary aid of those who brought them, disgracefully, into existence. It is difficult to discern what principle of policy it is, that will enable the father of illegitimate born children, to provide for those who have lived long enough to acquire a reputed name, that will exclude him from making provision for the child that is unborn, and who, when it comes into existence, will stand more in need of his assistance. Let the policy of the *English* Courts have been what it might in the reign of *Elizabeth*, it has long ceased to be the policy of *Maryland*, to have natural children unprovided for ; on the contrary, the subsequent marriage of the parents, legitimates the

prior born children; and if the father is so unnatural, as to leave the child unprovided for, he can be forced to do his duty, and compelled to take care of his offspring, although illegitimate."

These quotations will suffice to show, that Courts and Judges distinguished for their ability, have regarded *bastards* as having strong claims to equitable protection; on the other hand, it is due to candor to state, that there are cases where Courts have withheld from them every favorable intendment which the *lawful heir* would have been entitled to, as of course.

[18.] It cannot, I think, however, have escaped the most careless observer, that there is a remarkable tendency to relaxation in the law, every where, in behalf of illegitimate children—to look to the Penal Code, and to the guilty parties, for the punishment and prohibition of *fornication and adultery*, and not to visit the vengeance of the law upon those who are really innocent, notwithstanding they have to trace their birth to a source which is justly deemed criminal, by law and by religion, and to hold, that the law will not interpose to deny to those, who have been the authors of this misfortune, to repair it, as far as they can, by *gift, will or legislative enactment.*

[19.] Lastly, it is contended, that this Statute is *unconstitutional*, because it is a *judicial Act.* The 1st section of the 1st article of the Constitution of the State, declares, that "The legislative, executive and judiciary departments of the Government, shall be distinct, and each department shall be confided to a separate body of magistracy; and no person, or collection of persons, being of one of these departments, shall exercise any power properly attached to either of the others, except in the instances therein expressly permitted." *Prince*, 902.

The separation of the three powers of the Government is not as *total* as the terms of this article would seem to imply.

[20.] Whether the *sanction* of the Executive is necessary to an Act, before it can become a law, I think somewhat doubtful, under the Constitution. It is certain, however, that he can, by his *veto*, arrest an Act, unless passed by two-thirds of each branch of the Legislature. The Executive, then, may be said to be *united* with the Legislature in the passage of laws. The Judiciary is dependent on the Legislature, for the erection of Courts; for the apportionment of jurisdiction; for appointment to office; for compensation, and removal by impeachment. The Executive is

dependent on the Legislature for salary; for election, in the second instance, and removal by impeachment. This connection and dependence was intended to teach and inculcate kindness and forbearance—as each are, in some degree, checks upon the other.

[21.] The Constitution might have conferred upon any one or more of these departments, powers which, in their nature, would more appropriately belong to another; and it has done this in one striking instance, viz : in making it the business of the Legislature to originate and try all impeachments of public officers. This is, to all intents and purposes, a *judicial* proceeding.

[22.] In the absence of any specific grant, the power to legitimate bastard children, and to change the rules of descent, would devolve, necessarily, upon the *law-making* power. It may be transferred, by the Legislature, to the Judiciary, as it has been done in North Carolina; still it belongs, *originally* and appropriately, to the Legislature.

[23.] We entertain no doubt, that this Act is purely of a legislative character, one not prohibited by the Constitution, and which should be supported and construed favorably by the Courts.

[24.] And I gladly avail myself of this opportunity of disclaiming all undue sensitiveness or petty jealousy toward the other co-ordinate departments of the Government. I consider all equally patriotic, honorable and useful. It is natural, though much to be lamented, that jealousies should arise between them, as to the discharge of their respective duties. These should not be readily entertained, and each should divest themselves of every feeling, save that of devotion to the public good. Encroachments should not be suspected where none were intended; and should it ever become our unpleasant task to do, what we are here importuned to do, namely, set aside a Statute on account of its unconstitutionality, we have an abiding confidence in the liberality of the Legislature, that they will do us the credit to believe, that we acted only in obedience to the sternest convictions of duty.

[25.] In measures exclusively of a *political, legislative or executive* character—as the supreme authority, *as to these*, belongs to the *legislative* and *executive* departments—we shall always refuse, as we now do, to re-examine them here. Their mode of executing these powers, can never properly become the subject of

inquiry and investigation, before this or any other tribunal. In such cases, the remedy for any real or supposed abuse, is solely by an appeal to the people, at the elections.

[26.] But were this or any other question of a different nature, and capable of judicial inquiry and decision, then it would admit of a very different consideration—the action of either of the other departments, whether legislative or executive, being capable, in its own nature, of being brought to a judicial test, is subject to judicial revision. It is, in all such cases, as we conceive, that the judicial authority is the final and common arbiter, provided by the Constitution itself, and to whose decisions all others are subordinate. 1 *Story on the Constitution*, 345, '6, '7.

" It was well known and considered," says Mr. *Woodbury*, in the New Hampshire case already cited, that " in the distinct and separate existence of the judicial power, consists one main preservative of public liberty. 1 *Bl. Com.* 269. That, indeed, there is no liberty, if the power of *judging* be not separated from the *legislative* and *executive* powers. *Montesquieu, b.* 11, *ch.* 6. In other words, that the union of these two powers is tyranny. 7 *Johns. Rep.* 508. Or, as Mr. *Madison* observes, may justly be pronounced the very definition of tyranny. *Fed. no.* 47. Or, in the language of Mr. *Jefferson*, is precisely the definition of despotic government. *Notes on Virginia*, 195."

If the usurpation of *judicial* power by the other departments, is thus pointedly denounced and rebuked by the friends of free government, we will endeavor cautiously to abstain from any usurpation on our part.

We are, therefore, of the opinion, that the judgment rendered in the Superior Court ought to be affirmed.

*Per Curiam.*—Judgment affirmed.