317 Ga. 528
FINAL COPY

S23A0421.  STATE OF GEORGIA v. SISTERSONG WOMEN OF
    COLOR REPRODUCTIVE JUSTICE COLLECTIVE et al.

COLVIN, Justice.

The lawsuit giving rise to this appeal challenges the Living Infants Fairness and Equality Act ("LIFE Act"),[1] which regulates abortion procedures in Georgia.  Although Appellees claimed in the trial court that the LIFE Act violates the due-process, equal-protection, and inherent-rights provisions of the Georgia Constitution, see Ga. Const. of 1983, Art. I, Sec. I, Pars. I, II, XXIX, those claims were not ruled on below and are not part of this appeal because the trial court concluded that Appellees were entitled to relief on a different ground.  Specifically, the trial court concluded that certain provisions of the LIFE Act were void ab initio — that is, "[n]ull from the beginning"[2] — because, when the LIFE Act was enacted in 2019, those provisions violated the United States

---

[1] Ga. L. 2019, p. 711, §§ 4, 11.
[2] Black's Law Dictionary 1805 (10th ed. 2014) (defining "void ab initio").

Constitution as interpreted by then-controlling-but-since-overruled decisions of the United States Supreme Court. Here, we are concerned only with that ruling, and we conclude that the trial court erred. The holdings of United States Supreme Court cases interpreting the United States Constitution that have since been overruled cannot establish that a law was unconstitutional when enacted and therefore cannot render a law void ab initio. Because the trial court reached the opposite conclusion, we reverse its ruling, and we remand the case to the trial court to consider in the first instance Appellees' other challenges to the LIFE Act.

1. In 2019, the General Assembly passed, and the Governor signed, H.B. 481, also known as the LIFE Act. See Ga. L. 2019, p. 711, § 1. As relevant here, Section 4 of the LIFE Act amended OCGA § 16-12-141 to criminalize, with certain exceptions, abortion procedures "performed if an unborn child has been determined . . . to have a detectable human heartbeat";[3] and Section 11 of the LIFE

---

[3] As amended, OCGA § 16-12-141 (b) reads:
No abortion is authorized or shall be performed if an unborn

2

Act amended OCGA § 31-9B-3 to require a physician who performs an abortion after detecting a heartbeat to report to the Department of Public Health which exception to Section 4's ban on abortions justified the procedure.[4]

In 2019, many of the Appellees in the litigation now before us

---

child has been determined in accordance with Code Section 31-9B-2 to have a detectable human heartbeat except when:

> (1) A physician determines, in reasonable medical judgment, that a medical emergency exists;
>
> (2) The probable gestational age of the unborn child is 20 weeks or less and the pregnancy is the result of rape or incest in which an official police report has been filed alleging the offense of rape or incest. As used in this paragraph, the term "probable gestational age of the unborn child" has the meaning provided by Code Section 31-9B-1; or
>
> (3) A physician determines, in reasonable medical judgment, that the pregnancy is medically futile.

[4] As amended, OCGA § 31-9B-3 (a) reads:

Any physician who performs or attempts to perform an abortion shall report to the department, in conjunction with the reports required under Code Section 31-9A-6 and in accordance with forms and rules and regulations adopted and promulgated by the department:

> (1) If a detectable human heartbeat, as such term is defined in Code Section 1-2-1, exists, the probable gestational age, and the method and basis of the determination;
>
> (2) If a detectable human heartbeat, as such term is defined in Code Section 1-2-1, exists, the basis of the determination that the pregnant woman had a medically futile pregnancy, that a medical emergency existed, or that the pregnancy was the result of rape or incest; and
>
> (3) The method used for the abortion.

3

filed a challenge to the LIFE Act in the United States District Court for the Northern District of Georgia. See *SisterSong Women of Color Reproductive Justice Collective v. Kemp*, 472 FSupp.3d 1297, 1302 (N.D. Ga. 2020). In 2020, in the course of that litigation, the federal district court concluded on summary judgment that the LIFE Act's "pre-viability abortion ban . . . directly conflict[ed] with binding [United States] Supreme Court precedent," including *Roe v. Wade*, 410 U. S. 113 (93 SCt 705, 35 LE2d 147) (1973), and *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U. S. 833 (112 SCt 2791, 120 LE2d 674) (1992), which held that the United States Constitution protected a right to pre-viability abortion. *SisterSong*, 472 FSupp.3d at 1314 (II) (B) (2) (i). See *Roe*, 410 U. S. at 153 (VIII) (holding that a "right of privacy" under the United States Constitution "is broad enough to encompass a woman's decision whether or not to terminate her pregnancy"); *Casey*, 505 U. S. at 846 (I) (reaffirming "*Roe*'s essential holding" that a woman has a constitutional right "to choose to have an abortion before viability and to obtain it without undue interference from the State").

Accordingly, the federal district court entered an order declaring portions of the LIFE Act unconstitutional and permanently enjoining enforcement of the Act "in its entirety." *SisterSong*, 472 FSupp.3d at 1328 (III).

In *Dobbs v. Jackson Women's Health Organization*, 597 U. S. ___ (142 SCt 2228, 213 LE2d 545) (2022), however, the United States Supreme Court overruled *Roe* and *Casey*, holding that "the [United States] Constitution does not confer a right to abortion." *Dobbs*, 142 SCt at 2279 (IV). Following *Dobbs*, the United States Court of Appeals for the Eleventh Circuit vacated the federal district court's order enjoining enforcement of the LIFE Act and reversed the district court's judgment. See *SisterSong Women of Color Reproductive Justice Collective v. Governor of the State of Ga.*, 40 F4th 1320, 1328 (IV) (11th Cir. 2022).

Appellees then filed a new lawsuit against the State of Georgia in the Superior Court of Fulton County, challenging certain provisions of the LIFE Act both as void ab initio, based on federal constitutional precedent in force at the time of the LIFE Act's

5

enactment, and as invalid under the due-process, equal-protection, and inherent-rights provisions of the Georgia Constitution. See Ga. Const. of 1983, Art. I, Sec. I, Pars. I, II, XXIX. The State filed a motion to dismiss the complaint, arguing in relevant part that the LIFE Act was "not void *ab initio*." Appellees, in turn, filed a motion for partial judgment on the pleadings, arguing in relevant part that Sections 4 and 11 of the LIFE Act were void ab initio because those provisions would have been deemed unconstitutional under *Roe* and *Casey* when the LIFE Act was enacted.

On November 15, 2022, following a bench trial, the trial court issued an order declaring Sections 4 and 11 of the LIFE Act void ab initio and enjoining the State from enforcing those provisions.[5] The trial court reasoned that "controlling Georgia precedent" required it to assess the LIFE Act's constitutionality based on "the legal

---

[5] The trial court grounded its decision solely on its void ab initio analysis and expressly declined to reach the merits of Appellees' claims that the LIFE Act violates the due-process, equal-protection, and inherent-rights provisions of the Georgia Constitution. Although the dissenting opinion discusses those other claims, in this opinion, we consider only matters that the trial court ruled on and that are currently before us.

environment that existed when H.B. 481 was enacted" — that is, based on *Roe* and its progeny, rather than based on *Dobbs*. It further reasoned that, because Section 4 of the LIFE Act banned post-heartbeat, pre-viability abortions, and because such a ban "was unequivocally unconstitutional" under *Roe* and its progeny, Section 4 of the LIFE Act "was void *ab initio*," "did not become the law of Georgia when it was enacted," and "is not the law of Georgia now." Likewise, the court concluded that Section 11 of the LIFE Act was "void *ab initio*" because, under pre-*Dobbs* precedent, it "was unconstitutional" to "require[ ] that medical providers somehow publicly justify their decision to comply with their patients' wishes for a pre-viability procedure." Accordingly, the court granted Appellees' motion for partial judgment on the pleadings as to their constitutional challenges to Sections 4 and 11 and denied as moot the State's motion to dismiss Appellees' constitutional attacks on those provisions.[6] The State timely appealed from the trial court's

---

[6] The court's order also included other rulings not relevant to this appeal, and we do not disturb those rulings here.

order.  The State then filed an Emergency Petition for Supersedeas, seeking a stay of the trial court's order pending appeal, which we granted.

2. On appeal, the State argues that the trial court erred in relying on overruled decisions of the United States Supreme Court (*Roe* and *Casey*) to conclude that portions of the LIFE Act violated the United States Constitution when enacted and were therefore void ab initio.  We agree.  To explain why, we begin where the trial court did — with the Georgia Constitution's Judicial Review Clause and our void ab initio precedent.

(a) The Georgia Constitution's Judicial Review Clause provides that "[l]egislative acts in violation of this Constitution or the Constitution of the United States are void, and the judiciary shall so declare them."  *Lathrop v. Deal,* 301 Ga. 408, 428 (III) (B) (801 SE2d 867) (2017) (quoting Ga. Const. of 1983, Art. I, Sec. II, Par. V).   As we have explained, when a version of this Clause first appeared in the Georgia Constitution, "its text would have been understood quite clearly to embody the familiar doctrine of judicial review."  Id. at 429

(III) (B) (citing Ga. Const. of 1861, Art. I, Sec. XVII). Thus, as relevant here, "[t]he Judicial Review Clause is . . . a constitutional recognition of the inherent authority of a court to resolve conflicts between the Constitution itself and the statutory law, when the resolution of such conflicts is essential to the decision of a case already properly before the court." Id. at 432 (III) (B). When a conflict exists between the United States or Georgia Constitutions and a statute, and when such a conflict is presented to a court in a proper case, the Judicial Review Clause provides that "the judiciary shall . . . declare" the unconstitutional statute "void." Ga. Const. of 1983, Art. I, Sec. II, Par. V.

As a corollary of the principle that an unconstitutional statute is void, we have clarified that a statute is void if it violates either the Constitution that governed when the statute was enacted or another Constitution or constitutional amendment ratified after the statute's enactment date. See *Bldg. Auth. of Fulton County v. State of Ga.*, 253 Ga. 242, 243 (321 SE2d 97) (1984) ("The constitutionality of a law is to be determined by the constitution in effect on the date

9

the law became effective and by the constitution now in effect,"

where there has been a change to the relevant constitutional text

between the statute's enactment date and the constitutional

challenge to the statute.). In cases where a statute violated the

Constitution in effect on "the date of its passage," we have

sometimes referred to the statute as void ab initio. *Jones v.*

*McCaskill*, 112 Ga. 453, 455-456 (37 SE 724) (1900) (referring to

such a law as "ab initio absolutely void"), overruled on other grounds

by *Bldg. Auth.*, 253 Ga. 242.[7] See also, e.g., *Lawrence v. Lawrence*,

254 Ga. 692, 693 (2) (333 SE2d 610) (1985) (referring to such a law

---

[7] *Building Authority* overruled *Jones* to the extent that the case could be interpreted as holding that a statute need not comply with a later-ratified Constitution so long as it complied with the Constitution in effect when the statute was enacted. See *Bldg. Auth.*, 253 Ga. at 243 & n.1. We note that *Building Authority*'s statement that "[t]he constitutionality of a law is to be determined by the constitution in effect on the date the law *became effective* and by the constitution now in effect,*"* id. at 243 (emphasis supplied), should not be construed as modifying this Court's longstanding rule that the initial constitutionality of a statute must be assessed as of the statute's *enactment* date. See id. at 243-244 (1) (analyzing the initial constitutionality of the statute at issue as of "the time the 1980 act was *passed*," not as of the date the act became *effective* (emphasis supplied)). See also *Sherman v. Atlanta Independent School System*, 293 Ga. 268, 276 (2) (c) (744 SE2d 26) (2013) (noting the general rule that "the time with reference to which the constitutionality of an act of the General Assembly is to be determined is *the date of its passage*" (citation and punctuation omitted; emphasis supplied)).

as "void ab initio"); *Strickland v. Newton County*, 244 Ga. 54, 55 (1) (258 SE2d 132) (1979) ("The general rule is that an unconstitutional statute is wholly void and of no force and effect from the date it was enacted."); *Jamison v. City of Atlanta*, 225 Ga. 51, 51 (1) (165 SE2d 647) (1969) (holding that a statute was "void when passed" because it violated the Georgia Constitution in effect when the statute was passed).

(b) Relying on the Judicial Review Clause and our void ab initio precedent, the trial court concluded that portions of the LIFE Act were void when enacted in 2019 because they "were plainly unconstitutional [under the United States Constitution] when drafted, voted upon, and enacted." According to the trial court, this was true even though the LIFE Act would comply with the United States Constitution if enacted today and the same United States Constitution governs today as governed when the LIFE Act was enacted.[8]

---

[8] As the trial court put it, certain portions of the LIFE Act were "unequivocally unconstitutional" under the United States Constitution when

This incorrect conclusion rests on a faulty premise — that, in *Dobbs*, the United States Supreme Court changed not only its interpretation of the United States Constitution but also the meaning of the Constitution itself.[9] This could be true, however, only if (1) the United States Supreme Court, as opposed to the United States Constitution, is the source of the Constitution's meaning or (2) the United States Supreme Court has the power not only to interpret the Constitution but also to amend it. As explained below, both of these propositions conflict with well-established, foundational principles of law that are essential to our system of government.

First, although the United States Supreme Court has the ultimate authority to interpret the United States Constitution and to require other courts to apply its interpretation, see *Nordahl v.*

enacted, even though the LIFE Act would not violate the United States Constitution if "re-enacted in our post-*Roe* world," and even though the "words of the U. S. Constitution" remain "unchanged" since before *Roe*.

[9] According to the trial court, "there was" a "federal constitutional right to abortion" "[f]or 50 years" before *Dobbs* "change[d] [the] constitutional law." (Punctuation omitted.)

*State*, 306 Ga. 15, 20 (1) (829 SE2d 99) (2019), the Court is not the source of the Constitution's meaning.  Rather, a written constitution itself has a meaning that is fixed upon ratification and cannot change absent a constitutional amendment.  See *Olevik v. State*, 302 Ga. 228, 235 (2) (c) (i) (806 SE2d 505) (2017) (noting that it is a "fundamental principle that a constitutional provision means today what it meant at the time that it was enacted"); *South Carolina v. United States*, 199 U. S. 437, 448 (26 SCt 110, 50 LE 261) (1905) (noting that the United States Constitution's "meaning does not alter," and "[t]hat which it meant when adopted, it means now"), overruled on other grounds by *Garcia v. San Antonio Metro. Transit Auth.*, 469 U. S. 528 (105 SCt 1005, 83 LE2d 1016) (1985).  Thus, when a court engages in judicial review, the court does not supply the Constitution with a meaning the Constitution does not already have, but instead attempts to discern the meaning of the Constitution through interpretation so it can, among other things, "resolve conflicts between the Constitution *itself* and the statutory law." *Lathrop*, 301 Ga. at 432 (III) (B) (emphasis supplied).  This is

13

true whether a court of last resort is interpreting constitutional text for the first time or instead revisiting its prior interpretation of that text.[10]  Indeed, judicial review is a legitimate, rather than an arbitrary, exercise of judicial power only because "a written constitution" has a meaning of its own "established" not by the courts but by "the people" who ratified it, which courts must then "interpret" and "apply . . . to particular cases." *Marbury v. Madison*, 5 U. S. 137, 176-177 (2 LE 60) (1803).  See also *State v. SASS Group*, 315 Ga. 893, 898 (2) (a) n.7 (885 SE2d 761) (2023) (noting that constitutional interpretation is an "objective" inquiry into the

---

[10] Although the meaning of a constitutional provision does not alter over time, judicial interpretations of that meaning sometimes do.  This can occur because, among other things, constitutional interpretation is challenging; judges are not infallible; the judiciary may better understand the meaning of a constitutional provision over time based on additional scrutiny and analysis of its text and historical context; and the composition of a court of last resort may change, such that the balance of views on how to interpret the fixed meaning of a constitutional provision may shift.  See *Ammons v. State*, 315 Ga. 149, 163-164 (3) (880 SE2d 544) (2022) ("Construing a constitutional provision . . . requires careful attention to not only the language of the clause in question, but also its broader legal and historical context, which are the primary determinants of a text's meaning.  This kind of analysis is especially difficult when the language in question was first enacted long ago and rarely interpreted since, because those important contextual clues can be more difficult to unearth, and the ordinary meaning of language can change over time." (citation omitted)).

"public" meaning of constitutional language, not a "subjective" inquiry into what constitutional language means to a select few); *Olevik*, 302 Ga. at 236 (2) (c) (i) ("A provision of the constitution is to be construed in the sense in which it was understood by the framers and the people at the time of its adoption." (citation and punctuation omitted)). It is therefore well established that the United States Supreme Court is not the source of the United States Constitution's meaning.

Second, because "courts . . . are bound by" written constitutions, *Marbury*, 5 U. S. at 180 — not the other way around — the United States Supreme Court can no more amend the United States Constitution than this Court can amend the Georgia Constitution. See *Barrow v. Raffensperger*, 308 Ga. 660, 673 (3) (c) n.11 (842 SE2d 884) (2020) (noting "this Court has no legitimate authority to effectively amend our current Constitution by judicial opinion"); *Elliott v. State*, 305 Ga. 179, 216-217 (IV) (C) (ii) (824 SE2d 265) (2019) (noting that court decisions issued "after the adoption of [a provision in Georgia's 1877 Constitution] could not change [that

15

provision's] original public meaning"); *Lester v. United States*, 921 F3d 1306, 1312-1313 (B) (11th Cir. 2019) (W. Pryor, J., respecting the denial of rehearing en banc) (noting that there is a "difference between a change in judicial doctrine," that is, a change in "judges' understanding of the law," and a "change in law," which can only be accomplished by "a legislative act or constitutional amendment"). See also Letter from James Madison to N. P. Trist (Dec. 1831), in 9 The Writings of James Madison 471, 477 (Gaillard Hunt ed., 1910) ("There has been a fallacy . . . in confounding a question whether precedents could expound a Constitution, with a question whether they could alter a Const[itution]. This distinction is too obvious to need elucidation. None will deny that precedents of a certain description fix the interpretation of a law. Yet who will pretend that they can repeal or alter a law?"). Cf. 1 William Blackstone, *Commentaries on the Laws of England* 69-70 (noting that, when a court overrules a prior interpretation of the law, the court "do[es] not pretend to make a new law, but to vindicate the old one from misrepresentation"). Only ratification of a constitutional

amendment or a new constitution can change the meaning of the United States or Georgia Constitutions. See U. S. Const., Art. V (describing the procedures required for amending the United States Constitution); Ga. Const. of 1983, Art. X (describing the procedures required for amending or replacing the Georgia Constitution). See also *Camden County v. Sweatt*, 315 Ga. 498, 506 (2) (b) n.16 (883 SE2d 827) (2023) (noting that, in order to change the Georgia Constitution's meaning, the "only option was to propose a constitutional amendment"); *Hawke v. Smith*, 253 U. S. 221, 226-227 (40 SCt 495, 64 LE 871) (1920) ("The framers of the Constitution realized that it might in the progress of time and the development of new conditions require changes, and they intended to provide an orderly manner in which these could be accomplished; to that end they adopted the Fifth Article. . . . It is not the function of courts or legislative bodies, national or state, to alter the method [of changing the Constitution] which the Constitution has fixed."). Thus, the United States Supreme Court has no power to change the Constitution's meaning through constitutional interpretation.

17

In sum, then, the United States Constitution, not the United States Supreme Court, is the source of the Constitution's meaning; the United States Supreme Court has no power to amend the Constitution through interpretation; and the text of the United States Constitution has not been amended since the LIFE Act was enacted. Thus, the United States Constitution means today what it meant when the LIFE Act was enacted in 2019, even if the United States Supreme Court's interpretation of the Constitution has changed.

As a result, the trial court erred in concluding that, even though the LIFE Act complies with the United States Constitution today, the LIFE Act violated the United States Constitution when the LIFE Act was enacted. And, as explained below, because it is settled under Georgia law that Georgia courts are bound to apply now-controlling United States Supreme Court precedent on the meaning of the United States Constitution, we conclude that the trial court erred in relying on since-overruled United States Supreme Court decisions interpreting the United States

Constitution when determining that the LIFE Act was void ab initio.

(c) While "[i]t is the role of this Court, not the United States Supreme Court, . . . to construe the meaning of the Georgia Constitution," *Elliott*, 305 Ga. at 202 (III) (B) (iv), the same cannot be said about the United States Constitution. "[I]t is a fundamental principle that this Court is bound by the Constitution of the United States as its provisions are construed and applied by the Supreme Court of the United States." *Nordahl*, 306 Ga. at 20 (1) (citation and punctuation omitted). Thus, when the United States Supreme Court announces its interpretation of the United States Constitution, we are bound to apply that interpretation unless and until the decision is overruled. See, e.g., *Cooper Tire & Rubber Co. v. McCall*, 312 Ga. 422, 434 (2) (863 SE2d 81) (2021) (noting that, "[u]nless and until the United States Supreme Court overrules . . . [its] federal due process precedent[, that] precedent remains binding on this Court and lower federal courts"). And when the United States Supreme Court overrules its own precedent interpreting the United States Constitution, we are then obligated to apply the

19

Court's new interpretation of the Constitution's meaning on matters of federal constitutional law. See, e.g., *Young v. State*, 312 Ga. 71, 87-88, 90-91 (25) (a), (c) (i) (860 SE2d 746) (2021) (disapproving our prior decisions that conflicted with the United States Supreme Court's binding interpretation of the United States Constitution, where the Supreme Court had more recently held that the United States Constitution prohibited a state from imposing the death penalty on an intellectually disabled individual, overruling its prior decision that had reached the opposite conclusion); *Sermons v. State*, 262 Ga. 286, 287 (1) (417 SE2d 144) (1992) (noting that the United States Supreme Court had overruled in part its own prior decision interpreting the Eighth Amendment to the United States Constitution and applying the United States Supreme Court's most recent constitutional interpretation to the extent that it conflicted with overruled United States Supreme Court precedent).

It is clear from these well-established principles of Georgia law that a Georgia court must look to *Dobbs* — not *Roe* — in determining whether the LIFE Act was void ab initio when enacted in 2019. In

20

*Dobbs*, the United States Supreme Court overruled its earlier decision in *Roe*, declaring that "*Roe* was egregiously wrong from the start," *Dobbs*, 142 SCt at 2242-2243, and Georgia courts are "not permit[ted] . . . to persist in an error of *federal* constitutional law" when that error is clear under controlling United States Supreme Court precedent, *Lejeune v. McLaughlin*, 296 Ga. 291, 297-298 (2) (766 SE2d 803) (2014) (emphasis in original) (holding that we could not adhere to our precedent interpreting the United States Constitution, even though our interpretation had been based on a decision of the United States Supreme Court, because a subsequent Supreme Court decision clarified that our precedent was "simply wrong"). Accordingly, the trial court erred in analyzing whether the LIFE Act was void ab initio under now-overruled *Roe*-era precedent that controlled before *Dobbs* issued, rather than under the now-controlling *Dobbs* decision.

(d) Appellees and the dissenting opinion resist this conclusion. They argue that Georgia law, which requires courts to consider the constitutionality of a legislative act as of the time of its enactment,

21

compels Georgia courts to determine whether a statute is void ab initio based on court precedent that was controlling when the statute was enacted — even when that precedent has since been overruled. But the authorities on which Appellees rely provide no support for this proposition. And the dissenting opinion fails to explain why Georgia courts have authority to ignore now-controlling United States Supreme Court precedent on a matter of federal constitutional interpretation.

(i) First, Appellees point to the text of the Georgia Constitution's Judicial Review Clause, which, as noted above, provides that "[l]egislative acts in violation of this Constitution or the Constitution of the United States are void, and the judiciary shall so declare them." Ga. Const. of 1983, Art. I, Sec. II, Par. V. Appellees assert that this provision requires a court to "look to court interpretations of the period when the law was adopted" to determine whether the statute violates the United States or Georgia Constitutions. (Punctuation omitted.) But Appellees have not shown that the text of this constitutional provision, which does not

22

specify how the judiciary should determine a statute's constitutionality, supports their position.

Appellees argue only that the original version of this constitutional provision[11] was added to the Georgia Constitution "on the heels of" our decision in *Beall*, where we remarked that judicial review operates as "a noble guard against legislative despotism" by "render[ing] vain and fruitless" legislative "transgression[s] of [constitutional] bounds." *Beall v. Beall*, 8 Ga. 210, 220 (1850) (citation and punctuation omitted). As explained above in subdivision 2 (a), the Judicial Review Clause plainly preserves the validity of judicial review. But expressly vesting the courts with the power of judicial review does not establish that judicial decisions interpreting the Constitution somehow supply or change the meaning of the Constitution itself. Nor does it give overruled

---

[11] The original provision stated, "Legislative Acts in violation of the fundamental law are void; and the Judiciary shall so declare them." Ga. Const. of 1861, Art. I, Sec. 17. The 1865 Constitution replaced "fundamental law" in this provision with "the Constitution." Ga. Const. of 1865, Art. I, Sec. 13. The 1868 Constitution then replaced "the Constitution" with the phrase "this Constitution or the Constitution of the United States." Ga. Const. of 1868, Art. I, Sec. XXXII. That phrase has been carried forward to our current Constitution. See Ga. Const. of 1983, Art. I, Sec. II, Par. V.

judicial opinions binding effect after the date they were overruled.[12]

(ii) Second, relying on language from *Botts v. Southeastern Pipe-Line Co.*, 190 Ga. 689 (10 SE2d 375) (1940), and two cases quoting the same language from *Botts*, Appellees argue that a court must assess the constitutionality of a statute based on "the existing condition of the law," including "decisions of the courts." *Botts*, 190 Ga. at 700-701 (citation and punctuation omitted). This language, however, appears in the context of describing a canon of construction used to determine what a statute means, not whether a statute

---

[12] Appellees also briefly argue that separation-of-powers principles under the Georgia Constitution require courts to assess the constitutionality of a statute based on the constitutional precedent that existed when a statute was enacted. The argument seems to be that the General Assembly exercises judicial power when it passes a law knowing that the law will conflict with controlling constitutional precedent. But there is no merit to this argument. Under the Georgia Constitution, passing laws is a legislative power, whereas declaring laws unconstitutional is a judicial power. Compare Ga. Const. of 1983, Art. III, Sec. VI, Par. I ("The General Assembly shall have the power to make all laws not inconsistent with this Constitution, and not repugnant to the Constitution of the United States, which it shall deem necessary and proper for the welfare of the state."), with Ga. Const. of 1983, Art. I, Sec. II, Par. V ("Legislative acts in violation of this Constitution or the Constitution of the United States are void, and the judiciary shall so declare them."). Appellees have not shown that the act of passing a law that a court later determines is unconstitutional or passing a law that conflicts with prior court precedent infringes upon the power of the judiciary to declare laws unconstitutional.

24

complies with the United States or Georgia Constitutions.  See id. ("All statutes are presumed to be enacted by the legislature with full knowledge of the existing condition of the law and with reference to it.  They are therefore to be *construed* in connection and in harmony with the existing law, and as a part of a general and uniform system of jurisprudence, and their *meaning and effect* is to be determined in connection, not only with the common law and the constitution, but also with reference to other statutes and the decisions of the courts." (citation and punctuation omitted; emphasis supplied)); *Plantation Pipe Line Co. v. City of Bremen*, 227 Ga. 1, 9 (3) (178 SE2d 868) (1970) (quoting *Botts*, 190 Ga. at 700-701); *Retention Alternatives, Ltd. v. Hayward*, 285 Ga. 437, 440 (2) (678 SE2d 877) (2009) (quoting *Botts*, 190 Ga. at 700-701).  Because this appeal does not present any dispute about the substantive meaning of Sections 4 and 11 of the LIFE Act, these cases are inapplicable.

(iii) Finally, Appellees argue that our decision in *Adams v. Adams*, 249 Ga. 477 (291 SE2d 518) (1982), requires a court to evaluate the constitutionality of a statute based on "court

25

interpretations of th[e enactment] period." *Adams*, 249 Ga. at 479 (1). Appellees' reliance on this language from *Adams*, however, is misplaced.

In *Adams*, we considered the constitutionality of the 1979 version of the year's support statute, which gave a widow or widower a right to financial support from a decedent spouse's estate. See *Adams*, 249 Ga. at 478 (1). The year's support statute was first enacted in 1838, long before the ratification of the Fourteenth Amendment to the United States Constitution in 1868, and, as *Adams* stated, the statute was "superseded by" a 1958 act. Id. at 479 (1).[13] In 1979, following the United States Supreme Court's decision in *Orr v. Orr*, 440 U. S. 268 (99 SCt 1102, 59 LE2d 306) (1979), "which held the gender classification of the Alabama alimony law to be a denial of equal protection under the Fourteenth Amendment to the U. S. Constitution," the General Assembly revised the year's support statute again, this time to ensure that it

---

[13] The 1958 act stated that "Code section 113-1002, as amended, relating to year's support is hereby amended by striking said section in its entirety and in lieu thereof inserting the following . . . ." Ga. L. 1958, pp. 657, 665-666, § 11.

26

did not include sex-based distinctions that would violate *Orr*'s interpretation of the Fourteenth Amendment. *Adams*, 249 Ga. at 478 (1). "The superior court ruled that the year's support law, prior to the 1979 amendment," discriminated on the basis of sex and therefore "was unconstitutional based on the U. S. Supreme Court decision in *Orr*." Id. (citation omitted). Accordingly, the superior court concluded that the 1979 version of "the year's support statute must be declared unconstitutional on the theory that an amendment cannot breathe life into a statute void *ab initio*." Id.

On appeal, we reversed the superior court's ruling, holding "that the year's support statute as amended [in 1979 was] not unconstitutional." *Adams*, 249 Ga. at 479 (1). We explained that,

> [w]hile we have declared statutes to be void from their inception when they were contrary to the Constitution at the time of enactment, those decisions are not applicable to the present controversy, as the original year's support statute, when adopted, was not violative of the Constitution under court interpretations of that period. The earlier year's support laws were enacted before the ratification of the Fourteenth Amendment to the U. S. Constitution in 1868, and similar acts have remained in force for more than a century before *Orr*.

27

Id. (citations omitted).

According to Appellees, *Adams* assessed the constitutionality of the "original" 1958 year's support statute "based on what the U. S. Constitution meant as of 1958," not "based on *Orr*'s 1979 constitutional analysis," and this Court held "that the 1958 statute was valid because it was consistent with 'court interpretations of that period' — even though the judiciary would later conclude that the Constitution prohibits such gendered classifications." (Citation and emphasis omitted.) By analogy, Appellees contend that we must assess the constitutionality of the LIFE Act based on what the United States Constitution meant when the LIFE Act was enacted in 2019, not based on *Dobbs*'s 2022 constitutional analysis, and we must hold that the LIFE Act was void because it was inconsistent with "court interpretations of that period," namely, *Roe*-era precedents.

There may be more than one plausible way to interpret *Adams*,

but Appellees' interpretation of the case is not one of them.[14]

[14] On one reading of the case, *Adams* concluded that the Fourteenth Amendment, as interpreted by *Orr*, could not show that the "original" 1838 version of the year's support statute was "void from [its] inception" because "[t]he earlier year's support laws," including the "original" 1838 version of the statute, "were enacted before the ratification of the Fourteenth Amendment." *Adams*, 249 Ga. at 479 (1). On this reading, however, the phrase that Appellees rely on — "court interpretations of that period" — was irrelevant to this Court's analysis. Id. That phrase was dicta, serving only to contrast the period following the ratification of the Fourteenth Amendment, when, as *Orr* later indicated, there was reason to question the statute's constitutionality, with the period preceding the Fourteenth Amendment's ratification, when there was no basis for questioning the constitutionality of the year's support statute.

On another reading of *Adams*, this Court concluded that the "original" 1958 year's support statute, which "superseded" prior versions of the statute, violated the Fourteenth Amendment. *Adams*, 249 Ga. at 478-479 (1). But we nevertheless held that an exception applied to "[t]he general rule [ ] that an unconstitutional statute is wholly void and of no force and effect from the date it was enacted" because, if we were to declare the statute unconstitutional, "unjust results would accrue to those who justifiably relied on it." Id. (citation and punctuation omitted). See *James B. Beam Distilling Co. v. State of Ga.*, 259 Ga. 363, 366 (3) (382 SE2d 95) (1989) (noting that *Adams* had described an "exception" to the general "rule of voidness ab initio," which applied "where, because of the nature of the statute and its previous application, unjust results would accrue to those who justifiably relied on it"; describing *Adams* as a case in which this Court "applied its decision prospectively rather than retroactively"; and holding that "the exception to the general rule" applied in the instant case because "it would be unjust to declare the statute void ab initio" (citation and punctuation omitted)), rev'd, 501 U. S. 529 (111 SCt 2439, 115 LE2d 481) (1991). On this reading, *Adams* concluded that reliance on a pre-*Orr* understanding of the year's support statute's constitutionality was justifiable in part because there were no "court interpretations" before *Orr* that called into question the statute's constitutionality. *Adams*, 249 Ga. at 479 (1). But this interpretation does not help Appellees, who do not ask us to apply the type of exception to the void ab initio rule *Adams* described and instead ask us to apply the general rule that a statute is forever void if it was unconstitutional when enacted.

29

Appellees' interpretation of the case is implausible for three reasons.

First, as Appellees read *Adams*, the case represents a serious departure from the settled law described above in subdivisions 2 (b) and (c). Specifically, if Appellees' interpretation of *Adams* were correct, this Court in *Adams* would have failed to appreciate that the Fourteenth Amendment to the United States Constitution had a meaning even before it was interpreted; erroneously concluded that a judicial interpretation changed the meaning of the Fourteenth Amendment's text, even though that text had not changed; and disregarded controlling United States Supreme Court precedent interpreting the Fourteenth Amendment.

Second, Appellees' heavy reliance on the phrase "court interpretations of t[he enactment] period" is inconsistent with the

Because there is no plausible interpretation of *Adams* that supports Appellees' position on appeal, we need not definitively decide how the case should be interpreted. Nevertheless, we note that, to the extent that the first interpretation of *Adams* is accurate and this Court treated the 1979 year's support statute as belonging to an unbroken lineage of "earlier," "similar acts," stretching back to the "original" 1838 version of the statute, *Adams*, 249 Ga. at 479 (1), it appears that *Adams* may not have given due weight to the fact that, in 1958, a Code section "relating to year's support" was "amended by striking said section in its entirety" and replacing it with a new section. Ga. L. 1958, pp. 657, 665-666, § 11.

*Adams* decision as a whole. *Adams*, 249 Ga. at 479 (1). This is because, if "court interpretations of t[he enactment] period" had governed *Adams*'s analysis, as Appellees contend, the fact that *Orr* did not issue until 1979 and no other court decisions called into question the statute's constitutionality would have been dispositive in determining whether the 1958 statute was constitutional when enacted. Id. There would have been no reason for *Adams* to go on to emphasize in the next sentence that earlier versions of the statute existed "before the ratification of the Fourteenth Amendment." Id. The presence of that language clearly indicates that *Adams* did not view the absence of relevant constitutional precedent prior to *Orr* as dispositive in its analysis.

Finally, Appellees' interpretation of *Adams* cannot be squared with our body of void ab initio precedent. Specifically, the notion that Appellees advance — that *Adams* held that a statute's constitutionality when passed must be evaluated based on then-controlling decisions interpreting a constitutional provision — is belied by our cases holding statutes void ab initio without engaging

31

in any such analysis. See, e.g., *Jamison*, 225 Ga. at 51 (1); *Jones*, 112 Ga. at 454-455. Accordingly, Appellees' reliance on *Adams* is misplaced.[15]

(iv) Although the United States Supreme Court has clearly held that "the [United States] Constitution does not confer a right to abortion" and never did because "*Roe* was egregiously wrong from the start," *Dobbs*, 142 SCt at 2242-2243, 2279 (IV), the dissenting opinion asserts that the trial court correctly relied on *Roe* and its progeny in concluding that the LIFE Act was void ab initio. See Dissent Op. at 550-551. But the dissenting opinion fails to

---

[15] Appellees also cite *James B. Beam*, which quoted the language from *Adams* discussed above. See *James B. Beam*, 259 Ga. at 366 (3). However, assuming without deciding that some part of this Court's ruling in *James B. Beam* survived the United States Supreme Court's reversal of that opinion, the case does not support Appellees' position. This is because *James B. Beam* affirmed the trial court's decision that the statute in that case "was unconstitutional" when enacted, even though it would have been deemed constitutional under court interpretations from the enactment period and had in fact survived an earlier constitutional challenge. See id. at 364 (1), 366 (3). Further, this Court did not hold that the statute was void ab initio but rather that *an exception* applied to the general rule that an unconstitutional statute should be "declared" void ab initio because, under the particular facts of the case, such a declaration would cause "unjust results [to] accrue to those who justifiably relied on" the statute. Id. at 366 (3) (citation and punctuation omitted). That exception is irrelevant here, as Appellees do not seek to avail themselves of an exception to the general rule that a statute is void ab initio if it was unconstitutional when enacted.

adequately explain why Georgia law permitted, much less required, the trial court to apply now-overruled *Roe*-era precedent in making this determination.

The dissenting opinion "freely concede[s] that, after the United States Supreme Court overrules its own precedent interpreting the United States Constitution, Georgia courts must follow the United States Supreme Court's most recent pronouncement on that Constitution's meaning." Dissent Op. at 552. Yet, the dissenting opinion asserts that this interpretive rule, which it concedes is legally correct, does not apply when determining whether the LIFE Act was void ab initio. See Dissent Op. at 552. According to the dissenting opinion, this is because Georgia law contains a constitutional "doctrine" under which state courts must determine whether a statute was void ab initio based on "[b]inding decisional law" that existed when the statute was enacted, even when that decisional law has since been overruled. Dissent Op. at 547-548, 549-550 n.29, 551-552, 555. But, like Appellees, the dissenting opinion fails to cite any authority establishing the existence of such

33

a doctrine.[16]

At root, the dissenting opinion's contention that the void ab initio analysis is controlled by binding decisional law existing when a statute was enacted suffers from the same problems discussed above. See Dissent Op. at 547-548. It disregards the fact that the same United States Constitution governs today as governed when the LIFE Act was enacted. See Dissent Op. at 547-548, 550-552. It treats *Roe*, rather than the text of the United States Constitution, as the source of the Constitution's meaning. See Dissent Op. at 550-

---

[16] According to the dissenting opinion, this "doctrine" is "founded in the text of [the Georgia] Constitution," which requires "the General Assembly . . . [to] follow [the United States Supreme] Court's most recent pronouncement on the United States Constitution's meaning." Dissent Op. at 549-550 n.29, 552. But the dissenting opinion does not cite any provision of the Georgia Constitution requiring the General Assembly to exercise its legislative power within the confines of then-binding constitutional precedent, as opposed to within the bounds of the Constitution itself. See Dissent Op. at 546-547. And the only authority on which the dissenting opinion relies to establish the existence of a Georgia-law doctrine requiring courts to apply since-overruled constitutional precedent addresses the canon of statutory construction providing that, when interpreting a statute's "meaning and effect," we generally construe the statute "in connection and in harmony with the existing law," including "decisions of the courts." Dissent Op. at 547-548 & n.27 (quoting *Plantation Pipe Line*, 227 Ga. at 9 (3)). As explained above in subdivision 2 (d) (ii), however, that canon of construction does not apply here; and it does not require Georgia courts to apply overruled United States Supreme Court cases interpreting the United States Constitution when determining whether a statute violates the Constitution.

34

552.  And it views *Dobbs* as changing the Constitution's meaning, rather than as having interpreted that meaning.  See Dissent Op. at 550-552.

As explained above, however, the LIFE Act was enacted against the backdrop of the same United States Constitution that governs today.  The United States Supreme Court does not supply meaning to, and has no power to change, the independent and fixed meaning of the United States Constitution.  And we have no authority to defy now-controlling United States Supreme Court precedent interpreting the United States Constitution when determining whether the LIFE Act violated the Constitution at the time of its enactment.  The dissenting opinion is wrong to suggest otherwise.

3. For the reasons explained above, the trial court erred in relying on overruled decisions of the United States Supreme Court to conclude that portions of the LIFE Act violated the United States Constitution when enacted in 2019.  The same United States Constitution governs today as when the LIFE Act was enacted, and

Georgia courts are required to look to the United States Supreme Court's now-controlling interpretation of the United States Constitution when determining whether a statutory law violates that Constitution. Because *Dobbs* is controlling precedent on whether the United States Constitution confers a right to abortion, and because the parties and the trial court do not dispute that the LIFE Act complies with *Dobbs*, it follows that the LIFE Act did not violate the United States Constitution when enacted in 2019. Accordingly, the trial court erred in ruling that portions of the LIFE Act were void ab initio.

We recognize, of course, that the timing of the litigation underlying this appeal and the United States Supreme Court's decision to overrule its prior precedent combine to produce what at first glance might appear to be an unusual result. Because *Roe* and its progeny were controlling authority on the meaning of the United States Constitution when the LIFE Act was enacted, one reasonably could have expected at that time that the constitutionality of the LIFE Act would be evaluated under *Roe*-era precedent. Indeed, had

a claim that the LIFE Act violated the United States Constitution reached this Court and been ruled on before *Dobbs* issued, we would have applied *Roe* and its progeny in assessing whether it was void ab initio.

But we are not addressing a pre-*Dobbs* challenge to the LIFE Act. Because the United States Supreme Court clearly ruled in *Dobbs* that *Roe* and its progeny no longer control, we are not at liberty to apply *Roe*-era precedent in determining whether the LIFE Act was void ab initio. Rather, we must "faithfully apply" *Dobbs*, which is now the controlling "decision[ ] of the United States Supreme Court as to the meaning of [the United States Constitution]." *Elliott*, 305 Ga. at 187 (II) (C). See also *Pearson v. State*, 311 Ga. 26, 29 (2) n.5 (855 SE2d 606) (2021) ("Georgia courts have continued, as we are obliged to do on matters of federal constitutional law, to follow [a] holding of the United States Supreme Court . . . ."). Doing so "is not an act of judgment on our part" but rather a simple "act of obedience," which is required of us by virtue of our position in the constitutional order. *Elliott*, 305 Ga.

at 187 (II) (C).

We therefore reverse the trial court's determination that Sections 4 and 11 of the LIFE Act were void ab initio; reverse the trial court's grant of Appellees' motion for partial judgment on the pleadings and denial of the State's motion to dismiss on that basis; and remand the case for further proceedings consistent with this opinion.

*Judgment reversed and case remanded. All the Justices concur, except Ellington, J., who dissents, Peterson, P. J., disqualified, and Pinson, J., not participating.*

ELLINGTON, Justice, dissenting.

1. The trial court correctly granted in part the plaintiffs' motion for judgment on the pleadings on the basis that Section 4 and Section 11 of the Living Infants Fairness and Equality Act, Ga. L. 2019, p. 711, Act No. 234 (HB 481) ("the 2019 Act") were void on the date enacted and can never be enforced, despite the subsequent decision of the United States Supreme Court in *Dobbs v. Jackson Women's Health Organization*, 597 U. S. ___ (142 SCt 2228, 213

LE2d 545) (2022). I therefore dissent.

The United States Constitution did not when ratified, and does not now, expressly provide for judicial review of the validity of statutory law. Rather, in *Marbury v. Madison*, 5 U. S. 137 (1 Cranch) (2 LE 60) (1803), the Supreme Court of the United States famously found that such authority was necessarily implied in the authority of courts to render judgment in particular cases. The Georgia Constitution, on the other hand, since 1861 has expressly provided for judicial review of legislative acts as a fundamental principle of self-government.[17] Under this provision, Georgia courts have an

_____

[17] See Ga. Const. of 1861, Art. I, Sec. 17 ("Legislative Acts in violation of the fundamental law are void; and the Judiciary shall so declare them."); see also Ga. Const. of 1861, Art. I, Sec. 1 (fundamental principles of free government), Sec. 2 (consent of the governed). Before the express inclusion of judicial review as a constitutional imperative, the superior courts, and this Court, beginning in its first term, recognized the necessity of judicial review. See *Beall v. Beall*, 8 Ga. 210, 217 (1850) ("[I]f [a challenged] Act is a plain and palpable violation of the Constitution [of Georgia], this Court has the power, and it becomes its imperative duty, to declare it so."); *Nunn v. State*, 1 Ga. 243, 245-246 (1846) ("It is always with unfeigned reluctance that we approach a question involving the constitutionality of a state law. It is made our duty, however, in the present case, and we should be unworthy of the exalted station we occupy, if we were to shrink from its performance. . . . It ought seldom or ever to be decided, in a doubtful case, that a law is void for its repugnance to the Constitution. And it is not on slight implications and vague conjectures that the Legislature is to be pronounced to have transcended its powers. On

affirmative duty to declare Georgia laws that violate the United States Constitution or our state Constitution void. See *Aycock v. Martin*, 37 Ga. 124, 127 (1867) (Because the Georgia Constitution provides that "legislative acts in violation of the Constitution are void, and the judiciary shall so declare them[,]" if the act at issue "is in violation of the Constitution of the United States, and the Constitution of the State of Georgia, or either of them, then this Court is bound so to declare, by its judgment, under the most solemn obligations that can be imposed; indeed, it has no discretion in the matter but to obey the stern mandate of the supreme law of the land."); id. at 136 ("[I]f a legislative act oppugns a constitutional principle, the former must give way and be rejected on the score of repugnance. It is a position equally clear and sound, that in such cases it will be the duty of the Courts to adhere to the constitution,

---

the contrary, the opposition between the law and the Constitution should be such that the judges feel a clear and strong conviction of their incompatibility with each other. The presumption is in favor of every legislative act, and the whole burden of proof lies on him who denies its constitutionality." (emphasis omitted)); Albert Berry Saye, A Constitutional History of Georgia 1732-1945, pp. 188-195 (1948).

and to declare the act *null and void*." (emphasis in original)).[18] This provision was altered slightly in the 1865 Constitution,[19] altered again in the 1868 Constitution (the first to expressly reference both the federal and state constitutions), and has remained unchanged in every successive constitution.[20] This provision appears to be unique

---

[18] It is important throughout a discussion of the doctrine of void ab initio to distinguish between a "legislative act" and a statute, which the trial court was careful to do in this case. To put it simply, the General Assembly carries out its legislative function by introducing and voting on bills. Each bill includes a summary of the purpose of the act and may include legislative findings. A bill becomes "an act" when it becomes effective, typically upon approval by the governor. The General Assembly's acts are numbered and published in their entirety in the Georgia Laws series. Not all acts create, amend, or repeal statutes; for example, budget appropriations acts do not create, amend, or repeal any statute. Statutes that are created or amended by Acts of the General Assembly are compiled in the Code of Georgia, which is updated annually after the end of a legislative session. The summary of the purpose of an act is not published in the Code. Legislative findings included in an act are published in the Code only if so designated by the General Assembly in the act. The 2019 Act at issue in this case, Act No. 234 (HB 481), for example, comprised 16 sections, included legislative findings that were not published in the Code, amended eight Code sections, distributed among Titles 1, 16, 19, 31, and 48, entirely repealed one Code section in Title 31, provided for citizen standing in litigation challenging any of the Act's provisions, and made the provisions severable. The trial court in this case declared Sections 4 and 11 of the 2019 Act void ab initio.

[19] See Ga. Const. of 1865, Art. I, Sec. 13 ("Legislative Acts in violation of the Constitution are void, and the Judiciary shall so declare them.").

[20] See Ga. Const. of 1868, Art. II, Sec. XXXII ("Legislative acts in violation of this Constitution, or the Constitution of the United States, are void, and the Judiciary shall so declare them."); Ga. Const. of 1877, Art. I, Sec. IV, Par. II (same); Ga. Const. of 1945, Art. I, Sec. IV, Par. II (same); Ga. Const. of

41

among state constitutions.[21] Although the judicial declaration of unconstitutionality does not accomplish the legislative action of repealing any statute, a statute that is judicially declared to be unconstitutional is unenforceable.[22] Judicial review of the

---

1976, Art. I, Sec. II, Par. VIII (same); Ga. Const. of 1983, Art. I, Sec. II, Par. V ("Legislative acts in violation of this Constitution or the Constitution of the United States are void, and the judiciary shall so declare them.").

[21] I have found no other state constitution that provides a judicial-duty provision similar to Georgia's provision that "the judiciary shall . . . declare" unconstitutional laws "void," and only three other states' constitutions that even declare that unconstitutional laws are void. See Iowa Const. Art. XII, § 1 ("This constitution shall be the supreme law of the state, and any law inconsistent therewith, shall be void. The general assembly shall pass all laws necessary to carry this constitution into effect."); Kentucky Const. Bill of Rights § 26 ("To guard against transgression of the high powers which we have delegated, We Declare that every thing in this Bill of Rights is excepted out of the general powers of government, and shall forever remain inviolate; and all laws contrary thereto, or contrary to this Constitution, shall be void."); Rhode Island Const. Art. VI, § 1 ("This Constitution shall be the supreme law of the state, and any law inconsistent therewith shall be void. The general assembly shall pass all laws necessary to carry this Constitution into effect.").

[22] In *Herrington v. State*, 103 Ga. 318, 319-320 (29 SE 931) (1898), this Court relied on "exhaustive opinion" from the United States Supreme Court in *Norton v. Shelby County*, 118 U. S. 425, 442 (6 SCt 1121, 30 LE 178) (1886), concluding that "[a]n unconstitutional act is not a law; it confers no rights; it imposes no duties; it affords no protection; it creates no office; it is, in legal contemplation, as inoperative as though it had never been passed." See also *Commrs. of Roads & Revenues of Fulton County v. Davis*, 213 Ga. 792, 794 (1) (102 SE2d 180) (1958) ("The general rule is that an unconstitutional statute, though having the form and name of law, is in reality no law, but is wholly void, and in legal contemplation is as inoperative as if it had never been passed. Such a statute leaves the question that it purports to settle just as it would be had the statute not been enacted." (citation and punctuation omitted)).

constitutionality of a legislative act occurs in the context of a particular case and controversy. See *Sons of Confederate Veterans v. Henry County Bd. of Commrs.*, 315 Ga. 39, 49-53 (2) (b) (880 SE2d 168) (2022).

Dating back to Georgia's first constitution — even before judicial review was incorporated into our constitution — "the people, from whom all power originates, and for whose benefit all government is intended,"[23] have expressly limited the law-making authority that is delegated to our representatives in the state legislature. Specifically, the people of Georgia have prohibited the General Assembly from enacting unconstitutional laws. Our 1777 Constitution provided: "The House of Assembly shall have power to make such laws and regulations as may be conducive to the good order and well being of the State; provided such laws and regulations be not repugnant to the true intent and meaning of any rule or regulation contained in this constitution." Ga. Const. of 1777, Art. VII. Our next constitution, in line with other changes to the

[23] Ga. Const. of 1777, Preamble.

43

organization of the government, provided: "The General Assembly shall have power to make all laws and ordinances, which they shall deem necessary and proper for the good of the state, which shall not be repugnant to this constitution." Ga. Const. of 1789, Art. I, Par. XVI. This provision was carried forward in successive constitutions, with the requirement that Georgia laws not be repugnant to the United States Constitution being added in 1865 as part of Georgia's return to the Union.[24] See *Sears v. State*, 232 Ga. 547, 554 (3) (208

---

[24] See Ga. Const. of 1798, Art. I, Par. XXII ("The General Assembly shall have power to make all laws and ordinances, which they shall deem necessary and proper for the good of the state, which shall not be repugnant to this constitution."); Ga. Const. of 1861, Art. II, Sec. V, Par. I ("The General Assembly shall have power to make all laws and ordinances, consistent with this Constitution and not repugnant to the Constitution of the Confederate States, which they shall deem necessary and proper for the welfare of the State."); Ga. Const. of 1865, Art. II, Sec. V, Par. I ("The General Assembly shall have power to make all laws and ordinances consistent with this Constitution, and not repugnant to the Constitution of the United States, which they shall deem necessary and proper for the welfare of the State."); Ga. Const. of 1868, Art. III, Sec. V, Par. I ("The General Assembly shall have power to make all laws and ordinances, consistent with this Constitution, and not repugnant to the Constitution of the United States, which they shall deem necessary and proper for the welfare of the State."); Ga. Const. of 1877, Art. III, Sec. VII, Par. XXII ("The General Assembly shall have power to make all laws and ordinances consistent with this Constitution, and not repugnant to the Constitution of the United States, which they shall deem necessary and proper for the welfare of the State."); Ga. Const. of 1945, Art. III, Sec. VII, Par. XX ("The General Assembly shall have the power to make all laws consistent with

SE2d 93) (1974) (The General Assembly "is absolutely unrestricted in its power to legislate, so long as it does not undertake to enact measures prohibited by the State or Federal Constitution. This power of the legislature is set forth in our Constitution[.]" (citations omitted)).

Under well-settled Georgia law, a legislative act that is unconstitutional on the date it is enacted is void from its inception and forever afterward.[25] See *Strickland v. Newton County*, 244 Ga. 54, 55 (1) (258 SE2d 132) (1979) ("The general rule is that an unconstitutional statute is wholly void and of no force and effect

---

this Constitution, and not repugnant to the Constitution of the United States, which they shall deem necessary and proper for the welfare of the State."); Ga. Const. of 1976, Art. III, Sec. VIII, Par. I (same); Ga. Const. of 1983, Art. III, Sec. VI, Par. I ("The General Assembly shall have the power to make all laws not inconsistent with this Constitution, and not repugnant to the Constitution of the United States, which it shall deem necessary and proper for the welfare of the state.").

[25] Unlike in contract law, there is no such thing as a "voidable" statute. It is either void or not void. Black's Law Dictionary defines "voidable contract" as "[a] contract that can be affirmed or rejected at the option of one of the parties; a contract that is void as to the wrongdoer but not void as to the party wronged, unless that party elects to treat it as void." Black's Law Dictionary (11th ed. 2019). A "void contract," however, is defined as "[a] contract that is of no legal effect, so that there is really no contract in existence at all. A contract may be void because it is technically defective, contrary to public policy, or illegal." Id. No such procedure applies in challenges to unconstitutional laws.

from the date it was enacted."). "The time with reference to which the constitutionality of an act is to be determined is the date of its passage by the enacting body[;] and if it is unconstitutional then, it is forever void." *Grayson-Robinson Stores v. Oneida, Ltd.*, 209 Ga. 613, 617 (2) (75 SE2d 161) (1953) (citation omitted).[26] Binding decisional law informs any consideration of whether an act is constitutional when enacted.[27] A legislative enactment that is void ab initio, even though any statute it creates or amends may remain "on the books," cannot spring to life because of any subsequent change in the law, even a constitutional amendment or revision. See

---

[26] See also *In the Interest of R. A. S.*, 249 Ga. 236, 237 (290 SE2d 34) (1982) (same); *City of Atlanta v. Gower*, 216 Ga. 368, 372 (116 SE2d 738) (1960) (same); *Commrs. of Roads*, 213 Ga. at 794 (1) (same); *Christian v. Moreland*, 203 Ga. 20, 21 (45 SE2d 201) (1947) (same); *Jones v. McCaskill*, 112 Ga. 453, 456 (37 SE 724) (1900) (same); *Central of Ga. R. Co. v. State of Ga.*, 104 Ga. 831, 853 (31 SE 531) (1898) (If the act at issue "was unconstitutional as originally passed, . . . it simply amounted to no law, and was just as if there had never been any attempt to legislate upon the subject.").

[27] See *Plantation Pipe Line Co. v. City of Bremen*, 227 Ga. 1, 9 (3) (178 SE2d 868) (1970) ("All statutes are presumed to be enacted by the General Assembly with full knowledge of the existing condition of the law and with reference to it, and are therefore to be construed in connection and in harmony with the existing law, and as a part of a general and uniform system of jurisprudence, and their meaning and effect is to be determined in connection, not only with the common law and the Constitution, but also with reference to other statutes and *decisions of the courts*." (emphasis supplied)).

*Gilbert v. Richardson*, 264 Ga. 744, 751 (5) (452 SE2d 476) (1994)

("A statute declared unconstitutional is deemed void from its inception and is not revived merely because the constitutional infirmity is subsequently eliminated."); *In the Interest of R. A. S.*, 249 Ga. 236, 237 (290 SE2d 34) (1982) ("[W]here a statute is held to be unconstitutional and void in part, a subsequent constitutional amendment cannot revive the void portion."); see also Ga. Const. of 1983, Art. I, Sec. I, Par. X ("No . . . retroactive law . . . shall be passed.").[28] Nor can an unconstitutional act be corrected by

---

[28] See also *Grayson*, 209 Ga. at 617 (2) (Because a Georgia legislative enactment conflicted with federal statutory antitrust law, and violated the United States Constitution's Supremacy Clause and Commerce Clause, the Georgia law was void ab initio and could not become valid due to a subsequent change in the federal statutes that removed the conflict.); *Jamison v. City of Atlanta*, 225 Ga. 51, 51 (1) (165 SE2d 647) (1969) (To the extent, in Ga. L. 1951, p. 3027, the General Assembly delegated its exclusive power to alter the corporate limits of the City of Atlanta to the city or to the Superior Court of Fulton County, the act was "void when passed, and being void at that time, no subsequent amendment of the Constitution granting authority to the General Assembly to delegate to a municipality such legislative powers could give it vitality."); *Commrs. of Roads*, 213 Ga. at 793 (Where the original Workmen's Compensation Act, Ga. L. 1920, p. 167, was unconstitutional when passed in 1920 to the extent the General Assembly delegated to counties its authority to levy taxes to pay workmen's compensation to their employees, a constitutional amendment in 1945 that allowed the General Assembly to delegate that authority to counties of a certain population did not have the effect of re-enacting the 1920 Act.). An exception to the constitutional prohibition of

amending the act. See *City of Atlanta v. Gower*, 216 Ga. 368, 372

(116 SE2d 738) (1960).[29] Under Georgia law, a void legislative act

retroactive legislation is that a constitutional amendment can authorize a *specific* exception such that a legislative act that was unconstitutional when passed can be revived and made effective. See *Sherman v. Atlanta Independent School System*, 293 Ga. 268, 278 (2) (c) (744 SE2d 26) (2013) ("[W]hile the Constitution generally prohibits retroactive legislation, a constitutional amendment can expressly authorize an exception to that general rule." (citation omitted)); id. at 277-278 (2) (d) (An amendment to the Constitution's Redevelopment Powers Clause, as implemented by the subsequent revision of the Redevelopment Powers Law, both "established the rule for the future, and ratified what had been done in the past." Accordingly, despite this Court's previous holding that school taxes could not constitutionally be applied to a development that was not necessary or incidental to public schools or education, and despite the general rule against retroactive legislation, the resolutions of the school board and the other local government acts, which predated the constitutional amendment, approving the use of school taxes for a project unrelated to education were not unconstitutional and remained effective. (citations and punctuation omitted)); *Hammond v. Clark*, 136 Ga. 313, 313 (71 SE 479) (1911) (Where a legislative act is declared unconstitutional by this Court, the General Assembly proposes an amendment to the Georgia Constitution that cures the defect which had existed in the legislative act and also expressly ratifies the act as of the dates of its passage, and the voters ratify the constitutional amendment, the act is not void ab initio.).

[29] In *Gower*, we held that an act, Ga. L. 1960, p. 2848, which purported to amend an act passed the previous year, Ga. L. 1959, p. 3251, pertaining to local taxation, "could not add anything of substance" to the 1959 act, because the earlier act was invalid and unconstitutional when enacted and, therefore, could not be corrected by amending the act. *Gower*, 216 Ga. at 372. See R. Perry Sentell, Jr., Unconstitutionality in Georgia: Problems of Nothing, 8 Ga. L. Rev. 101, 105 (III) (1973) (describing *Gower* as evidence of this Court's "firm commitment to the void-from-inception doctrine").

The parties hotly contest the meaning of the following passage in *Adams v. Adams*, 249 Ga. 477 (291 SE2d 518) (1982), on the issue "whether the year's support statute [which had been amended in 1979 to eliminate any gender

classification] must be declared unconstitutional on the theory that an amendment cannot breathe life into a statute void *ab initioI*:

> While we have declared statutes to be void from their inception when they were contrary to the Constitution at the time of enactment, *City of Atlanta v. Gower*, 216 Ga. 368 (116 SE2d 738) (1960); *Grayson-Robinson Stores v. Oneida, Ltd.*, 209 Ga. 613 (75 SE2d 161) (1953); *Jamison v. City of Atlanta*, 225 Ga. 51 (165 SE2d 647) (1969); *Jones v. McCaskill*, 112 Ga. 453 (37 SE 724) (1900), those decisions are not applicable to the present controversy, as the original year's support statute, when adopted, was not violative of the Constitution under court interpretations of that period. The earlier year's support laws were enacted before the ratification of the Fourteenth Amendment to the U. S. Constitution in 1868, and similar acts have remained in force for more than a century before [*Orr v. Orr*, 440 U. S. 268 (99 SCt 1102, 59 LE2d 306) (1979), which held the gender classification of the Alabama alimony law to be a denial of equal protection under the Fourteenth Amendment to the U. S. Constitution], see Code Ann. § 113-1002 (Ga. L. 1838, Cobb, 296; superseded by Ga. L. 1958, pp. 657, 666); Code Ann. § 113-1003 (Ga. L. 1862-3, pp. 30, 31); Code Ann. § 113-1004 (Ga. L. 1865-6, p. 31); Code Ann. § 113-1006 (Ga. L. 1862-3, pp. 30, 31).
>
> We conclude that the year's support statute as amended is not unconstitutional.

*Adams*, 249 Ga. at 479 (1). I am not persuaded that this opaque passage in *Adams* constitutes a holding that, to determine whether a statute is void ab initio, Georgia courts look to "court interpretations of th[e] period" when the law was adopted. See *In the Interest of R. J. A.*, 316 Ga. 822, 824 (890 SE2d 698) (2023) (Pinson, J., concurring) ("[A] holding in an appellate opinion is a determination on a matter of law that is necessary to the decision in question. It is not always easy to figure out what parts of an appellate decision make up its holding. Questions about whether particular facts or reasoning are important or necessary to a decision, or just how necessary something must be to count as part of the holding, can be hard to answer."); *James B. Beam Distilling Co. v. State of Ga.*, 259 Ga. 363, 366 (3) (382 SE2d 95) (1989), rev'd on other grounds, 501 U. S. 529 (111 SCt 2439, 115 LE2d 481) (1991) (quoting *Adams*, including the "court interpretations of that period" language, in analyzing whether quoting *Adams*, including the "court interpretations of that period" language, in analyzing whether our ruling that an excise tax statute

49

can be made effective only by re-enactment, or, more precisely, a statute created or amended by a legislative act that was void at its inception can become effective only by passage of a new legislative act that is not void. See *Commrs. of Roads & Revenues of Fulton County v. Davis*, 213 Ga. 792, 793 (102 SE2d 180) (1958); *Grayson*, 209 Ga. at 613; id. at 617 (2).

Georgia's void ab initio doctrine operates in harmony with the presumption that an act of the General Assembly is constitutional and with the rules of constitutional avoidance. A court may declare an act void ab initio only if resolution of a case turns on whether an act is unconstitutional and only when the unconstitutionality is very

was unconstitutional should be given only prospective application as an exception to the general rule of voidness ab initio (citation and punctuation omitted)); *Lawrence v. Lawrence*, 254 Ga. 692, 693 (2) (333 SE2d 610) (1985) (quoting *Adams*, including the "court interpretation of that period" language, and concluding that "our holding in *Adams v. Adams* establishes that those year's support awards entered prior to the corrective amendment of the [year's support] statute are valid"). Even if, as the majority opinion holds, the plaintiffs' reliance on *Adams* as precedent is misplaced, see Majority Op. at 538-541 (2) (d) (iii), however, the trial court's ruling (which did not rely on *Adams* for this principle) is still correct. Georgia's void ab initio doctrine, founded in the text of our Constitution and explained in the cases that I have discussed, requires the consideration of whether, when an act is passed, binding precedent pronouncing the meaning of relevant constitutional provisions renders the act unconstitutional from inception.

clear.[30] And members of the public are entitled to presume that legislative acts are constitutional unless and until there is a judicial determination to the contrary.

Consequently, at this point in this litigation, the essential question is: When the 2019 Act was enacted, was the Act in violation

---

[30]. See *Barnhill v. Alford*, 315 Ga. 304, 311 (2) (b) (882 SE2d 245) (2022) ("In addressing the constitutionality of [a statute] we recognize that every reasonable construction must be resorted to in order to save a statute from unconstitutionality. This approach not only reflects the prudential concern that constitutional issues not be needlessly confronted, but also recognizes that [members of] the legislature, like [members of] this Court, [are] bound by and swear[ ] an oath to uphold the Constitution. The courts will therefore not lightly assume that the legislature intended to infringe constitutionally protected liberties or usurp power constitutionally forbidden it. Therefore, all presumptions are in favor of the constitutionality of an Act of the legislature[,] and[,] before an Act of the legislature can be declared unconstitutional, the conflict between it and the fundamental law must be clear and palpable[,] and this Court must be clearly satisfied of its unconstitutionality. Moreover, because statutes are presumed to be constitutional until the contrary appears, the burden is on the party alleging a statute to be unconstitutional to prove it." (citations and punctuation omitted)); *State v. Randall*, 315 Ga. 198, 200 (1) (880 SE2d 134) (2022) ("Properly enacted statutes carry a presumption of constitutional validity, and inquiry into the constitutionality of a statute generally should not be made by the trial courts if a decision on the merits can be reached without doing so."); *Sons of Confederate Veterans*, 315 Ga. at 65 (2) (d) (i) ("[A]s a matter of constitutional avoidance, we must not address a constitutional question where it is unnecessary to do so. . . . [I]t is well-settled that this Court will not decide a constitutional question if the decision in the appeal can be made upon other grounds[.]" (citation omitted)); *Turner County v. City of Ashburn*, 293 Ga. 739, 748-749 (749 SE2d 685) (2013) (The acts of the General Assembly are presumed to be constitutional, and courts "construe those acts as valid when possible."); *Plantation Pipe Line*, 227 Ga. at 9 (3).

51

of the Constitution of the United States?[31] As the trial court correctly held, Section 4 of the 2019 Act was void when passed because its ban on most abortions after embryonic cardiac activity can be detected, which the parties agree occurs at approximately six weeks after a woman's last menstrual period,[32] would unduly interfere with a

---

[31] The trial court has not yet ruled on the question whether the 2019 Act is in violation of the Constitution of Georgia. The trial court did not need to reach that question under Georgia's void ab initio doctrine after ruling that the Act was void when enacted. A case quoted in the majority opinion, *Bldg. Auth. of Fulton County v. State of Ga.*, 253 Ga. 242 (321 SE2d 97) (1984), reflects these alternative bases: "The constitutionality of a law is to be determined by the constitution in effect on the date the law became effective *and* by the constitution now in effect." Id. at 243 (emphasis supplied; footnote omitted)). See Majority Op. at 531-532 (2) (a). In other words, the constitutionality of a Georgia law is to be determined by whether it violated either the federal or state constitution when enacted (if so, it is unenforceable because it was void ab initio) and by whether it violates either constitution presently (if so, it is unenforceable because it is unconstitutional).

[32] As noted in the majority opinion, the 2019 Act amended OCGA § 16-12-141 (b), among other provisions, to prohibit abortions "if an unborn child has been determined in accordance with Code Section 31-9B-2 to have a detectable human heartbeat[,]" with specified exceptions. See Majority Op. at 528 (1); Ga. L. 2019, p. 711, § 4. Before the 2019 amendment, OCGA § 16-12-141 prohibited abortions when "the probable gestational age of the unborn child has been determined in accordance with Code Section 31-9B-2 to be 20 weeks or more[,]" with specified exceptions. The 2019 Act did not amend OCGA § 16-12-140, which defines the offense of "criminal abortion" as "when, in violation of Code Section 16-12-141, [a person] administers any medicine, drugs, or other substance whatever to any woman or when he or she uses any instrument or other means whatever upon any woman with intent to produce a miscarriage or abortion." OCGA § 16-12-140 (a). A conviction for the offense of criminal abortion is "imprisonment for not less than one nor more than ten years." OCGA § 16-12-140 (b).

woman's then-protected right under the United States Constitution to terminate a pregnancy before viability. See *Roe v. Wade*, 410 U. S. 113 (93 SCt 705, 35 LE2d 147) (1973); *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U. S. 833 (112 SCt 2791, 120 LE2d 674) (1992); *Etkind v. Suarez*, 271 Ga. 352, 354-355 (2) (519 SE2d 210) (1999) (recognizing the *Casey* Court's reaffirmation of "the right of the woman to choose to have an abortion before viability and to obtain it without undue interference from the State" and noting that "Georgia itself cannot unduly interfere with a woman's constitutional right to obtain an abortion" (citation and punctuation omitted)). Under clear, controlling precedent, the 2019 Act's six-week abortion ban, when enacted, violated the United States Constitution. In short, the six-week abortion ban was void ab initio.[33] And, as the trial court found, Section 11's requirement that

---

[33] The Supreme Court of Iowa, one of the few other states with a constitutional provision for judicial review of statutes, see n. 21, supra, recently refused to lift a permanent injunction on a six-week ban similar to the 2019 Act at issue in this case. Iowa's "fetal heartbeat law," was passed in 2018, and a trial court declared that the law was unconstitutional under then-existing federal and state precedent and permanently enjoined enforcement of

medical providers report to the government the exception applicable to any abortion after the development of embryonic cardiac activity makes no sense without Section 4's general ban of such abortions. Therefore, Section 11 falls along with Section 4. I freely concede that, after the United States Supreme Court overrules its own precedent interpreting the United States Constitution, Georgia courts must follow the United States Supreme Court's most recent pronouncement on that Constitution's meaning. But the General Assembly, under the Georgia Constitution, must *also* follow that Court's most recent pronouncement on the United States Constitution's meaning. Thus, after the *Dobbs* Court ended any protection under the United States Constitution of a right to terminate a pregnancy before viability, whatever restrictions on

the law. See *Planned Parenthood of the Heartland v. Reynolds*, 2023 Iowa Sup. LEXIS 68, 2023 WL 4635932 (Case No. 22-2036, decided June 16, 2023). (Note: the Court was evenly divided, so the lower court's ruling was affirmed by operation of law.) In refusing to lift the injunction following the *Dobbs* decision, the Supreme Court of Iowa described the 2018 heartbeat law as "a hypothetical law" that was "moribund when it was enacted" and had no chance of taking effect because it violated both the United States Constitution (under *Roe*, *Casey*, etc.) and the Iowa Constitution (under existing state court precedent that applied an "undue burden" test to abortion regulation). Id.

abortion that the General Assembly may see fit to pass will not be subject to review under pre-*Dobbs* federal precedent, *provided* that the legislative act was not void ab initio under Georgia's constitutional limits on legislative power. Because the 2019 Act was moribund when enacted, however, the change in doctrine subsequently wrought by the *Dobbs* decision cannot resuscitate it. To answer the majority opinion's challenge, see Majority Op. at 536-537 (2) (d); id. at 541-543 (2) (d) (iv), Georgia courts may not defy now-controlling United States Supreme Court precedent on a matter of federal constitutional interpretation, but, in deciding the specific question of whether a legislative act was void when enacted, Georgia courts may not ignore that the *General Assembly* defied then-controlling United States Supreme Court precedent on a matter of federal constitutional interpretation.

The State tries to flip the script and argues that the void ab initio doctrine actually *supports* its position and requires that the trial court's ruling be reversed. *Dobbs* is retroactive under federal law, the State argues, and therefore *Dobbs* "applies to events of

55

2019" when the Act at issue was passed "just as much as it applies to events in 2022" and beyond. The State argues that "[t]he basis of the void *ab initio* principle is that courts do not, by their decisions, amend the constitution or other governing law; they simply say what the law is, and therefore always has been." This argument falls apart immediately. The *Roe* Court held that a right to personal privacy that is broad enough to encompass a woman's decision whether to terminate her pregnancy before viability is protected under the United States Constitution, limiting the authority of states in regulating abortions. See *Roe*, 410 U. S. at 153; id. at 164-166. The *Roe* Court relied primarily on the Fourteenth Amendment and also relied in part on the First, Fourth, Fifth, and Ninth Amendments and cases interpreting those provisions. See *Roe*, 410 U. S. at 152-153. Under the State's argument, the *Roe* Court simply stated what the law under those constitutional provisions always has been. The *Dobbs* Court held that *Roe* was "egregiously wrong from the start"[34] and that the Fourteenth Amendment does not to

---

[34] *Dobbs*, 142 SCt at 2243.

any extent prohibit state regulation of abortion — how can this opposite holding too be "what the law always has been"? Plainly, the *Dobbs* decision did not mean that *Roe* had been written in magical disappearing ink. Otherwise, why would Justice Alito in the majority opinion in *Dobbs*, and Justice Kavanaugh in his concurring opinion, together state *seven* times that the Court, in accord with states' requests, was "return[ing]" the issue to "the people" and their "elected representatives" by allowing the states to regulate or prohibit pre-viability abortions?[35] In 1973, the *Roe* Court — rightly

---

[35] See *Dobbs*, 142 SCt at 2243 ("It is time to heed the Constitution and return the issue of abortion to the people's elected representatives."); id. at 2259 ("[W]e thus return the power to weigh those [policy] arguments [about abortion regulation] to the people and their elected representatives."); id. at 2277 ("Our decision returns the issue of abortion to those legislative bodies[.]"); id. at 2279 ("We therefore hold that the Constitution does not confer a right to abortion. *Roe* and *Casey* must be overruled, and the authority to regulate abortion must be returned to the people and their elected representatives."); id. at 2284 ("The Constitution does not prohibit the citizens of each State from regulating or prohibiting abortion. *Roe* and *Casey* arrogated that authority. We now overrule those decisions, and return that authority to the people and their elected representatives."); id. at 2305 (Kavanaugh, J., concurring) ("The Court's decision today properly returns the Court to a position of neutrality and restores the people's authority to address the issue of abortion through the processes of democratic self-government established by the Constitution."); id. at 2310 (Kavanaugh, J., concurring) ("The Court today properly heeds the constitutional principle of judicial neutrality and returns the issue of abortion to the people and their elected representatives in the democratic process."); see

or wrongly — took the issue of pre-viability abortion regulation away from the states, and in 2022 the *Dobbs* Court, expressly acknowledging that history,[36] reversed course and returned the issue to the states. In the intervening 50 years, *Roe* and its progeny were controlling law and, under the Fourteenth Amendment, bound the states to protect women's constitutional right to terminate a pregnancy before viability. See *Southern R. Co. v. Greene*, 216 U. S. 400, 412 (30 SCt 287, 54 LE 536) (1910) ("Whenever [the Federal Constitution's] protection is invoked[,] the courts of the United States, both state and Federal, are bound to see that rights guaranteed by the Federal Constitution are not violated by legislation of the State. One of the provisions of the Fourteenth Amendment[,] thus binding upon every State of the Federal Union[,]

---

also id. at 2279 ("[I]n this case, 26 States expressly ask us to overrule *Roe* and *Casey* and to return the issue of abortion to the people and their elected representatives."); id. at 2308 (Kavanaugh, J., concurring) ("In this case, . . . a majority of the States — 26 in all — ask the Court to overrule *Roe* and return the abortion issue to the States.").

[36] See *Dobbs*, 142 SCt at 2284; id. at 2309 (Kavanaugh, J., concurring) ("May a State retroactively impose liability or punishment for an abortion that occurred before today's decision takes effect? In my view, the answer is no based on the Due Process Clause or the Ex Post Facto Clause.").

prevents any State from denying to any person or persons within its jurisdiction the equal protection of the laws. If [a State] statute, as it is interpreted and sought to be enforced in the State[,] . . . deprives the plaintiff of the equal protection of the laws, it cannot stand."). The *Dobbs* Court did not (and could not) amend the United States Constitution, but it is sheer sophistry to maintain that it did not change that controlling law.

The majority opinion embraces the premise that the meaning of a constitutional provision is "fixed upon ratification" and is "independent" of judicial construction.[37] As we saw with the *Dobbs*

---

[37] See Majority Op. at 533 (2) (b) ("[A] written constitution itself has a meaning that is fixed upon ratification and cannot change absent a constitutional amendment." (citation omitted)); id. ("[T]he United States Constitution's 'meaning does not alter,' and '[t]hat which it meant when adopted it means now.'") quoting *South Carolina v. United States*, 199 U. S. 437, 448 (26 SCt 110, 50 LE 261) (1905), overruled on other grounds by *Garcia v. San Antonio Metro. Transit Auth.*, 469 U. S. 528 (105 SCt 1005, 83 LE2d 1016) (1985). Placing the *South Carolina* quote in context, however, shows that the general principles by which the people grant power to (or withhold it from) the government are meant to be adapted to changing conditions:

> The Constitution is a written instrument. As such its meaning does not alter. That which it meant when adopted it means now. Being a grant of powers to a government its language is general, and as changes come in social and political life it embraces in its grasp all new conditions which are within the scope of the powers in terms conferred. In other words, while the powers

Court, this premise, when coupled with a weakened adherence to the doctrine of stare decisis, allows a court's current majority to impose its view of the meaning of a constitutional provision, as if the slate has been entirely blank, not merely purporting to supersede

---

granted do not change, they apply from generation to generation to all things to which they are in their nature applicable.

*South Carolina*, 199 U. S. at 448-449. See *Griffin v. Illinois*, 351 U. S. 12, 26 (76 SCt. 585) (100 LE 891) (1956) (Frankfurter, J., concurring in judgment) ("We should not indulge in the fiction that the law now announced has always been the law. . . . It is much more conducive to law's self-respect to recognize candidly the considerations that give prospective content to a new pronouncement of law."). A case cited by the majority opinion, *Young v. State*, 312 Ga. 71 (860 SE2d 746) (2021), see Majority Op. at 536 (2) (c), discusses how the definition of "cruel and unusual punishment" did not include executing an intellectually disabled offender in 1989, according to the Supreme Court in *Penry v. Lynaugh*, 492 U. S. 302 (109 SCt 2934, 106 LE2d 256) (1989), but it did include that form of punishment just 13 years later, according to the Supreme Court in *Atkins v. Virginia*, 536 U. S. 304 (122 SCt 2242, 153 LE2d 335) (2002), due to the evolution of our national standards of decency and the development of a national consensus on the issue. The text of the Eighth Amendment did not change from its ratification in 1789, yet the judicial interpretation of the text changed, and the scope of its protection of human dignity changed, to reflect changing national values. In another context, in 1972, the Supreme Court did not even find a substantial federal question on the issue of whether the United States Constitution requires states to license and recognize the marriage of a same-sex couple. See *Baker v. Nelson*, 409 U. S. 810 (93 SCt 37, 34 LE2d 65) (1972). Then, in 2015, the Supreme Court found that the choice of marriage partner is among the liberties of personal choice central to individual dignity and autonomy protected by the Fourteenth Amendment. See *Obergefell v. Hodges*, 576 U. S. 644 (135 SCt 2584, 192 LE2d 609) (2015). Clearly, even without a constitutional amendment, the effect of a constitutional provision can change, and this occurs through the process of judicial review.

60

precedent — decades of precedent in the case of *Dobbs* — but to *erase* it. Such unrestrained disregard of precedent undermines the stability of the law and public confidence in the impartiality of judicial review.[38] Regrettably, the premise that the Constitution has a meaning independent of judicial construction, together with the *Dobbs* Court's conclusion that the Fourteenth Amendment *never* protected a woman's decision whether to terminate a pregnancy before viability, leads the majority in this case to allow the 2019 Act to shed the voidness that attached when it was enacted. See Majority Op. at 541 (2) (d) (iv). But Georgia's void ab initio doctrine,

---

[38] See *Dobbs*, 142 SCt at 2242 ("We hold that *Roe* and *Casey* must be overruled. The Constitution makes no reference to abortion, and no such right is implicitly protected by any constitutional provision, including the one on which the defenders of *Roe* and *Casey* now chiefly rely — the Due Process Clause of the Fourteenth Amendment. That provision has been held to guarantee some rights that are not mentioned in the Constitution, but any such right must be deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty. The right to abortion does not fall within this category." (citation and punctuation omitted)); id. at 2320 (Breyer, Sotomayor, and Kagan, JJ., dissenting) (Stare decisis "contributes to the actual and perceived integrity of the judicial process by ensuring that decisions are founded in the law rather than in the proclivities of individuals." (citation and punctuation omitted)); id. at 2319-2320 (Breyer, Sotomayor, and Kagan, JJ., dissenting) (On the right to abortion, "[t]he Court reverses course today for one reason and one reason only: because the composition of this Court has changed. . . . Today, the proclivities of individuals rule.").

our unique bulwark against legislative overreach, prevents subsequent judicial constructions from peeling away a legislative act's voidness-from-inception. To legislate in the post-*Dobbs* legal landscape, the General Assembly must legislate post-*Dobbs*.

The State side-steps the application of Georgia's void ab initio doctrine to the 2019 Act — a Georgia law — arguing that, if the void ab initio doctrine applies in this case, then the Mississippi statute that the Supreme Court upheld in *Dobbs* would itself be void ab initio, because, "[a]fter all, when Mississippi passed the statute [at issue in *Dobbs*], it was allegedly unconstitutional (at least in part) under *Roe* and its progeny."[39] The State does not even attempt to support its argument by showing that the authority of Mississippi's

---

[39] The Mississippi legislature passed House Bill No. 1510 on March 8, 2018, and the governor approved it, and it became effective, on March 19, 2018. The act was codified as Miss. St. § 41-41-191. A 2014 law, the Women's Health Protection and Preborn Pain Act, codified at §§ 41-41-131 through 41-41-145, had generally banned abortion at or after 20 weeks gestational age. See Miss. St. §§ 41-41-137 ("Except as otherwise provided by Section 41-41-141, a person may not perform or induce or attempt to perform or induce an abortion on a woman if it has been determined, by the physician performing, inducing, or attempting to perform or induce the abortion or by another physician on whose determination that physician relies, that the probable gestational age of the unborn child is twenty (20) or more weeks."); 41-41-147 (Abortions permitted by the act but prohibited by any other law are unlawful.).

legislature is restricted by a void ab initio doctrine anything like the constitutional limitations on the authority of Georgia's General Assembly. The citizens of Georgia have every right to place greater limitations on the authority of its legislative body than the citizens of other states might judge desirable or necessary.[40]

The State then raises the specter that Georgia's void ab initio doctrine subjugates the legislative branch of government to the judicial branch, arguing:

> The superior court's rule [in this case] would even deprive states of standing to appeal rulings that a statute is unconstitutional. Legislatures could never contest disputed court opinions by enacting new laws. Those laws would by definition be "void," leaving a court no appellate remedy to grant, no actual controversy to decide, and no

---

[40] In *Beall*, we quoted with approbation commentary by James Wilson, a former Associate Justice of the United States Supreme Court, on the supremacy of the constitution, as expressing the will of the people, over all three branches of government and on the duty of the judiciary to declare that a statute that clashes with the constitution must yield to the constitution, which is the fundamental law:

> The effects of this salutary regulation, necessarily resulting from the Constitution, are great and illustrious. In consequence of it, the bounds of the legislative power — a power the most apt to overleap its bounds — are not only distinctly marked in the system itself, but effectual and permanent provision is made, that every transgression of those bounds shall be adjudged and rendered vain and fruitless. What a noble guard against legislative despotism!

*Beall*, 8 Ga. at 220.

way to reconsider whether its prior judicial holdings were incorrect. States would lack any redress and thus would lack standing.

This bleak warning is misguided and misleading. Affirming the trial court's void ab initio ruling in this case would not mean that the General Assembly is barred from passing a law to test existing precedent. The General Assembly may pass any law for the welfare of the state that it believes is not inconsistent with the constitution of Georgia, and "not repugnant to the Constitution of the United States" — even if there is existing precedent to the contrary. The General Assembly can do so based on a good faith belief of the requisite number of its members that the existing precedent should be revisited and overruled. When such a law is challenged in the courts on the basis that it is unconstitutional, and the precedent under which the law is alleged to be unconstitutional is then reconsidered, then the General Assembly has successfully tested that precedent — whether the challenged precedent is affirmed or overruled. If the challenged precedent is affirmed, the law enacted

to test the precedent is void. If, on the other hand, the precedent under which the new law was unconstitutional is overruled, the General Assembly is then free to enact a law with the same ends as the void-when-enacted law. The effect of Georgia's unique void ab initio doctrine is simply that the void-when-enacted law does not take effect after the constitutional impediment is removed; instead, the law will take effect only if and when it is re-enacted. The very act before the Court now demonstrates that Georgia's void ab initio doctrine does not prevent the General Assembly from contesting disputed court opinions by enacting new laws. In the case of the 2019 Act, which facially violated firmly established precedent on federal constitutional limitations on states' authority to regulate or prohibit pre-viability abortions, the General Assembly passed a law that would test that precedent. It turned out to be Mississippi's 15-week abortion ban that the United States Supreme Court decided to hear to revisit *Roe* and *Casey*, but the 2019 Act enacted by the Georgia General Assembly could have been the vehicle for overruling those cases.

As the trial court found, Sections 4 and 11 of the 2019 Act cannot be enforced, as those provisions of that Act are void. To criminalize most abortions occurring after an embryo or fetus has detectable cardiac activity, and to mandate that physicians report to the government the exception relied upon to justify providing any abortion after that development, the General Assembly must re-enact those provisions now that the *Dobbs* decision has removed the federal constitutional impediment to regulation of pre-viability abortions. *Commrs. of Roads*, 213 Ga. at 793; *Grayson*, 209 Ga. at 613; id. at 617 (2).[41]

---

[41] I note that the General Assembly did not opt to pass a so-called "trigger law," specifying that the law would become effective only in the event that the United States Supreme Court overturned *Roe* and *Casey* or if a constitutional amendment enabled state regulation of abortions. See, e.g., Ark. Acts 2019, No. 180, § 2 ("This act [prohibiting abortions except to save the life of a pregnant woman in a medical emergency] becomes effective on and after the certification of the Attorney General that: (1) The United States Supreme Court overrules, in whole or in part, the central holding of *Roe v. Wade*, 410 U. S. 113 (1973), reaffirmed by *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U. S. 833 (1992), thereby restoring to the State of Arkansas the authority to prohibit abortion; or (2) An amendment to the United States Constitution is adopted that, in whole or in part, restores to the State of Arkansas the authority to prohibit abortion."); Idaho Laws 2020, Ch. 284, § 1 ("Notwithstanding any other provision of law, this section [prohibiting abortions except to prevent a pregnant woman from dying, or in cases of rape or incest] shall become effective thirty (30) days following the occurrence of

As a matter of public policy, requiring re-enactment is healthy for our democracy. It promotes public civic engagement, and it requires our legislators to be responsive to public opinion in light of new precedent and to consider the will of the people when making policy decisions that will profoundly affect them. In this case, the public may have understood, based on well-settled precedent, that the 2019 Act would have been struck down in whole or in part under *Roe*.[42] The *Dobbs* decision, however, dramatically changed the post-

---

either of the following circumstances: (a) The issuance of the judgment in any decision of the United States supreme court that restores to the states their authority to prohibit abortion; or (b) Adoption of an amendment to the United States constitution that restores to the states their authority to prohibit abortion."). I am not suggesting that the General Assembly should have passed a trigger law — such a law would subvert the re-enactment requirement of Georgia's void ab initio doctrine.

[42] And there was little reason when the Act was passed to doubt the durability of *Roe* and *Casey* as precedent. The *Dobbs* case was not pending in the United States Supreme Court — the General Assembly passed the 2019 Act on March 29, 2019, and the governor signed it on May 7, 2019, more than one year before the filing of a petition for a writ of certiorari in the *Dobbs* case and two years before the Court decided to take up Mississippi's 15-week ban and granted the petition. See *Dobbs v. Jackson Women's Health Org.*, 2020 WL 3317135 (Petition for Writ of Certiorari to the United States Court of Appeals for the Fifth Circuit, filed June 18, 2020); *Dobbs v. Jackson Women's Health Org.*, 593 U. S. __ (141 SCt 2619, 209 LE2d 748) (2021) (Petition for Writ of Certiorari, granted May 17, 2021). And at least two of the justices among the five who voted to overturn *Roe* and *Casey* testified at their confirmation hearings regarding the great importance of those cases as precedent, given that

*Roe*'s essential holding regarding the constitutional protection of the right to choose a pre-viability abortion had been reaffirmed many times on the merits and especially given the precedent on *Roe* as precedent — *Casey* and other cases that examined the several stare decisis factors and held that stare decisis counseled against reexamination of the merits of the *Roe* decision. See Confirmation Hearing on the Nomination of the Hon. Brett M. Kavanaugh to be an Associate Justice of the Supreme Court of the United States: Hearing Before the S. Comm. on the Judiciary, 115th Cong. 127 (2018) (testimony of J. Brett Kavanaugh) ("I said that [*Roe*] is settled as a precedent of the Supreme Court, entitled the respect under principles of stare decisis. And one of the important things to keep in mind about *Roe v. Wade* is that it has been reaffirmed many times over the past 45 years, . . . and most prominently, most importantly, reaffirmed in *Planned Parenthood v. Casey* in 1992. And . . . the Supreme Court did not just reaffirm [*Roe*] in passing. The Court specifically went through all the factors of stare decisis in considering whether to overrule it, and the joint opinion of Justice Kennedy, Justice O'Connor, and Justice Souter, at great length went through those factors. That was the question presented in the case."); id. at 128 ("[*Roe*] is important precedent of the Supreme Court that has been reaffirmed many times. But . . . the point . . . that I think is important [is that] *Planned Parenthood v. Casey* reaffirmed *Roe* and did so by considering the stare decisis factors. So *Casey* now becomes a precedent on precedent. It is not as if [*Roe*] is just a run of the mill case that was decided and never been reconsidered, but *Casey* specifically reconsidered it, applied the stare decisis factors, and decided to reaffirm it. That makes *Casey* a precedent on precedent."); id. at 245 (In response to a question whether Judge Kavanaugh, in previous employment in the George W. Bush administration, took the position that not all legal scholars believe that *Roe v. Wade* is the settled law of the land, that the Supreme Court could overturn it as precedent, and that, in fact, there were a number of Justices who would do so: "[S]ome legal scholars have undoubtedly said things like that over time, but that is different from what I as a judge — my position as a judge is that there are 45 years of precedent and there is *Planned Parenthood v. Casey*, which reaffirmed *Roe*, so that is precedent on precedent, as I have explained, and that is important. And that is an important precedent of the Supreme Court."); Confirmation Hearing on the Nomination of the Hon. Samuel A. Alito, Jr., to be an Associate Justice of the Supreme Court of the United States: Hearing Before the S. Comm. on the Judiciary, 109th Cong. 321 (2006) (testimony of J. Samuel Alito) ("I agree with the underlying thought that when a precedent is reaffirmed, that strengthens the precedent[.] . . . [W]hen a precedent is

*Roe* legal landscape. The re-enactment requirement integral to Georgia's void ab initio doctrine affords its citizens an opportunity to communicate to their elected representatives their preferences in light of such a drastically altered legal landscape.

The re-enactment requirement also comports with the

reaffirmed, each time it's reaffirmed that is a factor that should be taken into account in making the judgment about stare decisis, and when a precedent is reaffirmed on the ground that stare decisis precludes or counsels against reexamination of the merits of the precedent, then I agree that that is a precedent on precedent."); id. at 454-455 ("[W]hat I have said about *Roe* is that if the issue were to come before me if I am confirmed, and I'm on the Supreme Court, . . . the first step in the analysis for me would be the issue of stare decisis, and that would be very important. . . . [A] great deal has happened in the case law since [I opined in a 1985 job application that *Roe* should be overruled]. *Thornburgh* was decided, and then *Webster* and then *Casey* and a number of other decisions. So the stare decisis analysis would have to take account of that entire line of case law. . . . *Roe v. Wade* is an important precedent of the Supreme Court. It was decided in 1973, so it has been on the books for a long time. It has been challenged on a number of occasions, . . . and the Supreme Court has reaffirmed the decision, sometimes on the merits, sometimes [as] in *Casey* based on stare decisis, and I think that when a decision is challenged and it is reaffirmed that strengthens its value as *stare decisis* for at least two reasons. First of all, the more often a decision is reaffirmed, the more people tend to rely on it, and second, I think stare decisis reflects the view that there is wisdom embedded in decisions that have been made by prior Justices who take the same oath and are scholars and are conscientious, and when they examine a question and they reach a conclusion, I think that's entitled to considerable respect, and of course, the more times that happens, the more respect the decision is entitled to[.] . . . If [the term ']settled [law of the land'] means that [*Roe*] is a precedent that is entitled to respect as stare decisis, and all of the factors that I've mentioned come into play, including the reaffirmation and all of that, then it is a precedent that is protected, entitled to respect under the doctrine of stare decisis in that way.").

69

separation of powers. See *In re Judicial Qualifications Comm. Formal Advisory Opinion No. 239*, 300 Ga. 291, 298 (2) (794 SE2d 631) (2016) ("[T]he judicial discernment of constitutional, statutory, or common law is an exercise of judicial power, and in Georgia, the judicial power is vested exclusively in the [courts.]" (citation and punctuation omitted)).[43] Because Sections 4 and 11 of the 2019 Act violated the United States Constitution, were void when enacted, and remain void, it is premature for the judiciary to be asked to consider, now that the *Dobbs* decision has removed the federal constitutional impediment to regulation of pre-viability abortions, whether a six-week abortion ban that the General Assembly may enact in the future would violate the Georgia Constitution. Whether a six-week abortion ban is consistent with Georgia's Constitution

---

[43] See also Ga. Const. of 1983, Art. I, Sec. II, Par. III ("The legislative, judicial, and executive powers shall forever remain separate and distinct; and no person discharging the duties of one shall at the same time exercise the functions of either of the others except as herein provided."); Art. VI, Sec. I, Par. I ("The judicial power of the state shall be vested exclusively in" designated classes of courts.); *Etkind*, 271 Ga. at 353 (1) ("[T]he doctrine of separation of powers is an immutable constitutional principle which must be strictly enforced. Under that doctrine, statutory construction belongs to the courts, legislation to the legislature." (citations and punctuation omitted)).

should be debated and decided in the first instance by Georgia's legislature, in light of existing precedent regarding the liberty interests the Georgia Constitution protects, including a right to privacy. Accordingly, this Court should affirm the trial court's ruling that Sections 4 and 11 of the 2019 Act were void ab initio.

2. Because the majority opinion in this case is reversing the trial court's judgment that the 2019 Act's six-week abortion ban was void ab initio, the case will be returned to the trial court for resolution of the question whether, as the plaintiffs argue, the six-week ban violates the due-process, equal-protection, and/or inherent-rights provisions of the Georgia Constitution. See Ga. Const. of 1983, Art. I, Sec. I, Pars. I, II, and XXIX. Provided the trial court distinctly rules on any of these novel constitutional questions, we can expect this issue to return to this Court.[44]

---

[44] This Court's exclusive appellate jurisdiction is established by Ga. Const. of 1983, Art. VI, Sec. VI, Par. II. See *State v. Davis*, 303 Ga. 684, 687 (1) (814 SE2d 701) (2018). That paragraph provides in pertinent part:
> The Supreme Court shall be a court of review and shall exercise exclusive appellate jurisdiction in the following cases:
> (1) All cases involving the construction of a treaty or of the

In addressing whether the 2019 Act's six-week ban infringes any of these rights under the Georgia Constitution, the trial court will need to grapple with Georgia's historical recognition of a liberty interest, often shorthanded as "a right to privacy," to be let alone to live according to one's own preferences, subject only to such restraints as are necessary for the common welfare. See *Pavesich v. New England Life Ins. Co.*, 122 Ga. 190 (50 SE 68) (1905).[45] The trial

---

Constitution of the State of Georgia or of the United States and all cases in which the constitutionality of a law, ordinance, or constitutional provision has been drawn in question[.]

"We have interpreted this jurisdictional provision to extend only to constitutional issues that were distinctly ruled on by the trial court and that do not involve the application of unquestioned and unambiguous constitutional provisions or challenges to laws previously held to be constitutional against the same attack." *Davis*, 303 Ga. at 687 (1) (citation and punctuation omitted).

[45] See also *Powell v. State*, 270 Ga. 327, 329 (3) (510 SE2d 18) (1998) (This Court, in *Pavesich*, was the first "court of last resort in this country" to recognize the right to privacy, "making this Court a pioneer in the realm of the right of privacy."); *Zant v. Prevatte*, 248 Ga. 832, 834 (286 SE2d 715) (1982) (The right to privacy includes the right to refuse even life-saving medical treatment.); *Pavesich*, 122 Ga. at 190 ("The right of privacy is embraced within the absolute rights of personal security and personal liberty."); id. at 197-199 (The Georgia Constitution protects the right to privacy, which is derived from natural law, in provisions which declare that no person shall be deprived of liberty except by due process of law and that the right of the people to be secure in the persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated.); *Fincher v. State*, 231 Ga. App. 49, 53-54 (3) (497 SE2d 632) (1998) (The right to privacy "consists of two inter-related strands; one protects an individual's interest in avoiding disclosure of personal matters

court's consideration will not be limited by cases interpreting the United States Constitution, because the "right to be let alone" guaranteed by the Georgia Constitution has long been recognized to be "far more extensive" than any right to privacy protected by the United States Constitution. *Powell v. State*, 270 Ga. 327, 330 (3) (510 SE2d 18) (1998).[46] The right to privacy guaranteed by the Georgia Constitution is a fundamental individual right.[47] Therefore, if the

---

(the confidentiality strand) and the other protects an individual's interest in making certain personal decisions free of government interference (the autonomy strand)." (citation and punctuation omitted)); OCGA § 31-39-1 (legislative findings that, in the interest of "protecting individual autonomy," and in recognition of patients' "dignity and privacy," patients may instruct health care personnel to refrain from performing cardiopulmonary resuscitation); Joel Feinberg, Autonomy, Sovereignty, and Privacy: Moral Ideals in the Constitution?, 58 Notre Dame L. Rev. 445, 446 (1983) (The term "right of privacy" in the context of constitutional law represents the concept of personal autonomy and self-governance.).

[46] See *Powell*, 270 Ga. at 330-331 (3) (The United States Constitution "protects only those matters deeply rooted in this Nation's history and tradition or which are implicit in the concept of ordered liberty." (citation and punctuation omitted)).

[47] See *Powell*, 270 Ga. at 329 (3) (Since this Court's decision in *Pavesich*, "the Georgia courts have developed a rich appellate jurisprudence in the right of privacy which recognizes the right of privacy as a fundamental constitutional right, having a value so essential to individual liberty in our society that its infringement merits careful scrutiny by the courts." (citation and punctuation omitted)); id. (The right to privacy under the Georgia Constitution is "immutable and absolute."); *Pavesich*, 122 Ga. at 194 (The right to privacy is "fundamental" because it is "derived from natural law," which means that the right is not derived from or granted by the constitution, and,

trial court determines that the 2019 Act's six-week abortion ban in Section 4 infringes on the right to privacy, the trial court will need to determine whether the criminalization of most abortions after embryonic cardiac activity can be detected serves a compelling state interest and is narrowly tailored to effectuate only that interest.[48]

Likewise, for Section 11, the trial court will need to determine whether requiring providers of some abortion services to report to a state agency the justification for certain abortions serves a compelling state interest and is narrowly tailored to effectuate only that interest.

---

to the extent that provisions protecting particular aspects of the right are included in the constitution, infringement of the right by the government was specifically prohibited, on account of gross violations in the past.).

[48] See *King v. State*, 276 Ga. 126, 127-128 (2) (577 SE2d 764) (2003) ("When an individual challenges the State's action for violating the fundamental right to privacy, the State must show that its intrusion into the individual's private life serves a compelling state interest and is narrowly drawn to achieve that interest."); *Powell*, 270 Ga. at 333 (3) ("As judicial consideration of the right to privacy has developed [since *Pavesich*], this Court has concluded that the right of privacy is a fundamental right and that a government-imposed limitation on the right to privacy will pass constitutional muster if the limitation is shown to serve a compelling state interest and to be narrowly tailored to effectuate only that compelling interest."); id. at 334 (3) (Legislation in exercise of the state's police power "must serve a public purpose and the means adopted to achieve the purpose must be reasonably necessary for the accomplishment of the purpose and not unduly oppressive upon the persons regulated.").

In determining whether Sections 4 and 11 of the 2019 Act serve a compelling state interest, the trial court must interrogate, and not assume as a given, the state's claimed interest in preserving human life from the time of conception.[49] A clear enunciation of the basis for and scope of the interest the legislation is intended to protect is necessary to the determination of whether the state's interest is compelling and whether the legislation is narrowly tailored to serve only that interest.[50] Undoubtedly, challenges to other sections of the

---

[49] In the law at issue in *Dobbs*, the Mississippi legislature asserted an interest in "protecting the life of the unborn." *Dobbs*, 142 SCt at 2284. The *Dobbs* majority condemned the dissent for its lack of "any serious discussion of the legitimacy of the States' interest in protecting fetal life." Id. at 2261. But the *Dobbs* majority itself lacked any serious discussion of the legitimacy or scope of the states' interest in protecting embryonic or fetal life. The *Dobbs* majority merely posited as established that "respect for and preservation of prenatal life at all stages of development" is a legitimate state interest. Id. at 2284. See *Powell*, 270 Ga. at 335-336 (3) (The fact that a law may reflect the moral choice of the majority does not "exempt" a law regulating private conduct "from judicial review testing [its] constitutional mettle."); see id. at 337 (Sears, J., concurring) ("Simply because something is beyond the pale of 'majoritarian morality' does not place it beyond the scope of constitutional protection.").

[50] See *King v. State*, 272 Ga. 788, 790 (1) (535 SE2d 492) (2000) (A patient's medical information "is certainly a matter which a reasonable person would consider to be private."); id. at 792 (1) ("[U]nlimited use of the subpoena power in a criminal case might well serve the State interest of law enforcement, [but] it cannot be said to do so in a reasonable manner if it violates the accused's constitutional right of privacy." (punctuation omitted)); id. at 793-794 (1) (To the extent that a statute permitted the State to obtain a patient's

2019 Act will turn in part on the definition of the government's

interest that will shape this case.[51]

_____

medical records by issuing an ex parte subpoena, the statute as applied to her violated her constitutional right to privacy, because she had not waived her right to privacy as to the records and was not given notice and an opportunity to object before the hospital released them.); *Powell*, 270 Ga. at 333-334 (3) (In light of the existence of criminal statutes that prohibit conduct that amounts to sexual assault or that would inadvertently expose the public to the intimacies of others, the statute prohibiting private, consensual sodomy did not serve a compelling state interest but only served "to regulate the private sexual conduct of consenting adults," which is conduct that "Georgians' right of privacy puts beyond the bounds of government regulation."); id. at 336 (3) ("[I]nsofar as [the sodomy statute] criminalizes the performance of private, unforced, non-commercial acts of sexual intimacy between persons legally able to consent, [it] manifestly infringes upon a constitutional provision which guarantees to the citizens of Georgia the right of privacy." (citation and punctuation omitted)).

[51] For example, Section 3 of the 2019 Act defines as a "natural person" any "member of the species Homo sapiens at any stage of development who is carried in the womb[.]" Ga. L. 2019, p. 711, § 3; see OCGA § 1-2-1 (b) ("'Natural person' means any human being including an unborn child."); (e) (2) ("As used in [OCGA § 1-2-1], the term . . . '[u]nborn child' means a member of the species Homo sapiens at any stage of development who is carried in the womb."). Section 3 invites litigation on the issue whether embryos at stages of development earlier than when cardiac activity can be detected are protected by the federal or state Constitution.

Decided October 24, 2023.

OCGA § 16-12-141; constitutional question. Fulton Superior Court. Before Judge McBurney.

*Christopher M. Carr, Attorney General; Stephen J. Petrany, Solicitor-General, Ross W. Bergethon, Deputy Solicitor-General*, for appellant.

*Caplan Cobb, Julia B. Stone, Sarah Brewerton-Palmer, Katherine W. Gamsey; Bondurant Mixson & Elmore, Tiana S. Mykkeltvedt, Michael B. Terry, Jane D. Vincent, Laurie Ann Taylor, Amber D. Greenaway; ACLU Foundation of Georgia, Cory H. Isaacson, Nneka Ewulonu; ACLU Foundation, Julia Kaye, Rebecca Chan, Brigitte Amiri, Johanna Zacarias; Center for Reproductive Rights, Jiaman A. Wang, Cici Coquillette; Planned Parenthood Federation of America, Kyla Eastling*, for appellees.

*Theodore E. Rokita, Thomas M. Fisher, James A. Barta; Councill Gunnemann & Chally, Rebecca L. Kolb, Katherine L. D'Ambrosio, Jennifer R. Virostko; Jennifer N. Ide*, amici curiae.